**VALLEY BANK OF NEVADA, a Nevada Banking corporation, Plaintiff–Appellee,**

v.

**PLUS SYSTEM, INC., a Delaware membership corporation, Defendant–Appellant.**

No. 89–16287.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 13, 1990.

Decided Sept. 11, 1990.

M. Lawrence Popofsky, Heller, Ehrman, White & McAuliffe, San Francisco, Cal., for defendant-appellant.

Steven R. Kuney, Williams & Connolly, Washington, D.C., for plaintiff-appellee.

Before FLETCHER, PREGERSON and NELSON, Circuit Judges.

FLETCHER, Circuit Judge:

Plus System, Inc. ("Plus") appeals the district court's grant of summary judgment to Valley Bank of Nevada ("Valley") on Plus's claim that a Nevada statute violates the commerce clause of the United States Constitution.[1] Under the statute, ATM networks may not prohibit a Nevada bank from charging transaction fees to an automated teller machine (ATM) cardholder who withdraws funds from the Nevada bank's ATM but whose account is with another bank. We affirm.

## FACTS

Valley is a Nevada bank with branches throughout the state. Plus is a shared automated teller machine (ATM) network, of which Valley is a founding member. In a shared ATM network, account holders can use their own bank's ATM card to withdraw cash from another bank's ATM (a "foreign" transaction). Banks would not be willing to permit foreign cardholder withdrawals without assurances that the cardholder's home bank will reimburse the withdrawal. Through shared ATM networks, banks subscribe to one set of rules governing the entire membership so that the banks need not contract separately with each other for reimbursement, which would be cost prohibitive.

Under the Plus network rules, the "acquirer bank" (the bank whose ATM machine disburses the money) charges the "issuing bank" (the bank holding the consumer's account) 50¢ (the "interchange fee") and the network 10¢ for each withdrawal. The issuing bank can charge its account holder whatever it wants for providing the card service. Frequently, the *issuing* bank charges an additional "foreign fee" to its account holder for a withdrawal from a foreign bank (any bank other than the issuing bank). The Plus rules, however, prohibit *acquirer* banks from charging foreign cardholders (those who hold accounts with another bank) a separate "transaction fee" on withdrawals. Plus rules limit them to the 50¢ charged to the foreign bank and 10¢ charged to the network.

Valley decided in September 1988 that it wanted to charge a separate transaction fee. It argued its case to Plus, but Plus ultimately decided, in early 1989, to table the issue for further study. Valley filed an antitrust suit against Plus in March. While the suit was ongoing, a Nevada act, SB 404, went into effect on June 16, providing that an agreement to share ATMs "may not prohibit, limit or restrict the right of a financial institution to charge a customer any fees allowed by state or federal law, or require a financial institution to limit or waive its rights or obligations under this chapter." *Codified at* Nev.Rev. Stat. § 660.095(3) (1989). Valley supplied the impetus to the legislature to pass SB 404 ("the Act").[2]

In addition to promoting competition, the Act's ostensible purpose is to enable Nevada banks to deploy more ATMs by permitting them to charge the transaction fee, providing more revenue for deployment. Deploying more machines provides better service to tourists visiting Nevada, espe-

---

**1.** "The Congress shall have Power ... To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const., art. I, § 8, cl. 3.

**2.** A Valley officer testified before the relevant Senate and Assembly committees in hearings on the Act. The testimony indicates, however, that American Express also openly supported the legislation. Minutes of the Nevada State Legislature, Assembly Commerce Committee, at 2 (June 7, 1989).

cially its casinos, who need cash at all hours of the day. More machines would also benefit Nevada residents in the state's many less populous locales where a bank could not afford to place a machine without extra revenue. ATMs' initial installation and subsequent maintenance, repair, and security are very expensive. Maintenance and security are more costly for "off-premises" machines [3] than for on-premises machines because they are geographically distant from the bank. Furthermore, a bank cannot be sure that the volume at an off-premises machine will be high enough to warrant its installation. The bank's own customers ensure high volume at on-premises machines. The costs of off-premises machines are therefore higher while the volume is usually lower.[4]

Soon after the Act became law, Valley announced its intention to begin charging a transaction fee at its off-premises ATMs, most of which were at casinos, but a few of which were at airports and the Hoover Dam. Plus informed Valley that it believed SB 404 violates the commerce clause. Valley amended its complaint in the pending lawsuit to ask for a declaratory judgment that the statute is constitutional.

The parties agreed to join issue on the constitutionality question and filed motions for summary judgment. The district court granted Valley's and denied Plus's motion, finding that the statute does not directly regulate or discriminate against interstate commerce. The statute applies evenhandedly and promotes legitimate state interests while burdening interstate commerce only incidentally. Plus appeals. We have jurisdiction under 28 U.S.C. § 1291.

## STANDARD OF REVIEW

We review *de novo* a district court's construction of a statute and grant of summary judgment, as well as its resolution of constitutional issues. *In re Armstrong,* 840 F.2d 651, 652 (9th Cir.1988) (construction of statute); *Paulson v. Bowen,* 836 F.2d 1249, 1250 (9th Cir.1988) (summary

judgment); *Actmedia, Inc. v. Stroh,* 830 F.2d 957, 962 (9th Cir.1986) (constitutional issues). Summary judgment is appropriate if the evidence viewed in the light most favorable to the nonmoving party reveals no remaining genuine issues of material fact and the district court applied the relevant substantive law. *Tzung v. State Farm Fire & Casualty Co.,* 873 F.2d 1338, 1339–40 (9th Cir.1989).

## DISCUSSION

The Supreme Court has outlined a "two-tiered approach to analyzing state economic regulation under the Commerce Clause." *Brown–Forman Distillers Corp. v. New York State Liquor Auth.,* 476 U.S. 573, 578–79, 106 S.Ct. 2080, 2083–84, 90 L.Ed.2d 552 (1986).

> When a statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, we have generally struck down the statute without further inquiry. When, however, a statute has only indirect effects on interstate commerce and regulates evenhandedly, we have examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits.

*Id.* at 579, 106 S.Ct. at 2084 (citations omitted). Under either the per se or the balancing inquiry, "the critical consideration is the overall effect of the statute on both local and interstate activity." *Id.*

Plus argues that because SB 404 directly regulates and discriminates in favor of Nevada and against interstate commerce, the court should find it per se invalid. Alternatively, Plus argues that SB 404 excessively burdens interstate commerce in spite of any state interests legitimating the statute.

## I. PER SE INQUIRY

### A. *Direct Regulation*

■ "Direct regulation" occurs when a state law directly affects transactions that

---

3. Machines not located at a bank branch.

4. Only 2300–2400 transactions take place per month even at the casino ATMs. About 3500 are necessary for the bank to break even.

"take place across state lines" or entirely outside of the state's borders. *Edgar v. MITE Corp.*, 457 U.S. 624, 641, 102 S.Ct. 2629, 2640, 73 L.Ed.2d 269 (1982) (plurality opinion). Such a statute is invalid per se, regardless of whether the state intended to inhibit interstate commerce. *Id.* at 642, 102 S.Ct. at 2640–41; *Shafer v. Farmers Grain Co.*, 268 U.S. 189, 199, 45 S.Ct. 481, 485, 69 L.Ed. 909 (1925). A court must therefore consider the "practical effect" of the state law on interstate commerce in evaluating its validity under the commerce clause. *Healy v. Beer Inst., Inc.*, — U.S. —, 109 S.Ct. 2491, 2499, 105 L.Ed.2d 275 (1989); *Brown–Forman*, 476 U.S. at 579, 106 S.Ct. at 2084.

Plus argues that SB 404 regulates commerce outside Nevada by regulating the rules and interdependent economic relationships in shared ATM networks and regulating the operations of network member banks. Plus also argues that SB 404 violates the commerce clause as direct regulation because it thwarts the regulatory uniformity and consistency essential to an activity like a shared ATM network.

1. Network rules and interdependent economic relationships in networks.

■ Plus first alleges that SB 404 is direct regulation of interstate commerce because, through SB 404, Nevada, rather than the network, makes the network rules and directly regulates the "interdependent economic relationships" in networks.[5] Plus correctly asserts that a network must have rules that all members agree to follow. Without such rules, the network would fall apart. Member banks must know in particular that they will be reimbursed for disbursals to foreign bank cardholders and that they will be paid enough for this service to justify their costs. Plus argues that its no-transaction-fee rule is necessary to the network's efficient operation. The

rule helps allocate risks and benefits incurred by the members, essential to the network's survival. SB 404 takes away its power to make such rules.

This argument goes too far. Plus is claiming essentially that no state can prohibit companies from contracting in certain ways when one of the companies is from another state. At the extreme, this argument would mean that a state could make no rules to which commercial contracts with non-state-resident parties must conform. On the contrary, Plus's ability to make its own rules has always been subject to legitimate federal and state regulation. Even the Plus member agreement recognizes this.[6] Furthermore, the no-transaction-fee rule is not inherently necessary to an ATM network's existence. Other networks exist without it, for example, Star and In–Nevada, two other networks operating in Nevada.[7]

Plus's interdependence argument tries to dress up a basic, unadorned characteristic of all commerce. All commerce and all contracts allocate risks and benefits. A network's allocation is usually more complex given its size and number of contracting parties. States and the federal government nevertheless may enact legislation that affects the interdependent relationships constituting commercial activity. *See, e.g., Northwest Cent. Pipeline Corp. v. State Corp. Comm'n*, 489 U.S. 493, 109 S.Ct. 1262, 1280–82, 103 L.Ed.2d 509 (1989) (Kansas regulation governing production of Kansas natural gas purchased by interstate gas pipeline); *Goldberg v. Sweet*, 488 U.S. 252, 109 S.Ct. 582, 102 L.Ed.2d 607 (1989) (Illinois tax on Illinois phone service subscribers for long distance phone calls originating or terminating in Illinois); *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987) (Indiana Act regulating takeovers of

---

**5.** Although Plus asserts these claims separately, because its network rules are the means by which it governs the interdependent economic relationships among its members, the claims make essentially the same argument.

**6.** "To the extent not prohibited by applicable law or regulation, all qualified ATMs must ...

[n]ot permit a transaction fee to be added to the amount of the transaction, unless it is a Local transaction."

**7.** Star is a national network. In–Nevada is made up of Nevada banks and one Utah bank.

Indiana corporations). A network is not per se exempt from such governmental action.

### 2. Non–Nevada banks.

■ Plus also asserts that SB 404 directly affects the operations of member banks not located in Nevada. The ATM transaction involves four entities: the issuing bank, the acquirer bank, the customer, and the central computer "switch," which processes the transactions. When the customer requests the cash, the request passes through the switch to the issuing bank. The issuing bank then sends back a message through the switch telling the acquirer bank whether the issuing bank approves the transaction (in essence, whether the customer has funds in her account sufficient to cover the withdrawal). The acquirer bank then either delivers the cash or cancels the transaction. Each day, the Plus network settles accounts and the issuing bank transfers the withdrawn funds to the acquirer bank.[8]

The request for funds as sent to the issuing bank through the switch includes the actual consumer-requested cash amount plus the 60¢ charged to the issuing bank, of which 50¢ goes to the acquirer bank and 10¢ to Plus. If the acquirer bank could charge a transaction fee, the fee amount would be added to the funds request. The request itself, however, does not itemize the fees; it includes only the total amount needed to complete the transaction. If the customer asks for $100 and there is no transaction fee, the automated funds request will be for $100.60. If there is a $1 transaction fee, the request will be for $101.60.

Plus argues that such transactions require the involuntary participation of the issuing banks. Although the customer must respond to the ATM's query whether she wants to pay the charge, and she receives her cash in Nevada, the transaction fee is actually imposed on her at her home bank where it is deducted from her account. The issuing bank *must* impose and collect the transaction fee and then pay it to the acquirer bank. According to Plus, therefore, for non-Nevada bank cardholders, the fund request and payment take place outside of Nevada's borders, but Nevada nevertheless can dictate terms governing the out-of-state transaction.

Contrary to Plus's assertion, the customer making an ATM withdrawal purchases the service while at the ATM *in Nevada*. A sign on the ATM and the ATM screen both tell her of the transaction fee and that Valley imposes it.[9] She must respond affirmatively that she will pay the fee before the machine will continue with the transaction.[10] Under Plus's argument, the cost of a tackle box bought in Carson City with a check drawn on Grace National Bank in Cherokee, Oklahoma is actually imposed on the purchaser in Cherokee. A Nevada law requiring two forms of identification from customers who write checks would set the conditions under which Grace may let its account holders write checks. This would be a commerce clause violation under Plus's reasoning. Plus's argument fails. By paying the ATM transaction fee from the customer's account, the bank simply disburses funds as requested by the customer in Nevada, analogous to honoring a customer's check.

### 3. Uniformity and consistency.

■ Plus argues that shared ATM networks, as interdependent economic entities, are the kind of activity that the Supreme Court has recognized are not suited to diverse regulation by the states. Under the Supreme Court's most recent instruction, the practical effect of the statute must be evaluated not only by considering the consequences of the statute itself, but

---

**8.** In practice, this is a little more complicated because acquirer banks are also issuing banks, and vice versa.

**9.** The record contains unrefuted evidence that most consumers know that the acquirer bank, not the issuing bank, is charging the fee.

**10.** SB 404 includes these signage and screen requirements.

also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every State adopted similar legislation. Generally speaking, the Commerce Clause protects against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State.

*Healy*, 109 S.Ct. at 2499.

The cases Plus cites as examples of courts finding uniformity necessary fall within either the "sports" or "transportation" categories. The transportation cases are distinguishable from the one before us. State transportation laws pose different obstacles to entities engaged in interstate commerce than does SB 404. In *Southern Pacific Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761, 775, 65 S.Ct. 1515, 1523, 89 L.Ed. 1915 (1945), inconsistent state laws often required railroad companies to change a train's length when it crossed a state border or else to run shorter trains. The same was true of trucks in *Raymond Motor Transp. Co. v. Rice*, 434 U.S. 429, 98 S.Ct. 787, 54 L.Ed.2d 664 (1978). In *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 79 S.Ct. 962, 3 L.Ed.2d 1003 (1959), different states required or prohibited different kinds of mudguards, requiring truckers to change when crossing borders.

A state law permitting its banks to charge an ATM transaction fee does not pose the same kind of barrier to the ATM network. Only the amount requested from the issuing bank changes. The network does not have to retool machines; the transaction takes no more time; there is little if any additional paperwork. Although the law prevents a network from enforcing its rule, the commerce clause does not exist to protect a business's right to do business according to whatever rules it wants. Plus speculates that other states will pass similar but inconsistent legislation, but inconsistent state laws on transaction fees can coexist without conflict as long as each state regulates only its own banks.[11]

The sports cases involve challenges under antitrust laws and the commerce clause to professional sports league rules.[12] Professional sports leagues have a limited number of teams,[13] with no more than a few and rarely more than two teams in any state. The challenged state legislation in each case would have had significant impact on the whole league fabric, not just on the state's one or two teams. Decisions in sports cases thus deal with the unique entity of the national professional sports league and have not been applied in other factual settings.

Neither is the shared ATM network factually similar to a professional sports league. Plus repeats over and over that the no-transaction-fee rule is necessary to the network's efficient operation, making uniformity of state laws necessary to its interstate commerce. The success of other networks that permit their member institutions to charge such fees demonstrates

11. Four other circuits have upheld state statutes regulating credit agreements between buyers in one state and mail-order sellers in other states. Although goods actually crossed state lines and the statutes specifically limited the interest rate on credit card transactions, even for out-of-state mail-order businesses, the statutes survived commerce clause challenges. *See Aldens, Inc. v. Miller*, 610 F.2d 538 (8th Cir.1979); *Aldens, Inc. v. Ryan*, 571 F.2d 1159 (10th Cir.1978); *Aldens, Inc. v. LaFollette*, 552 F.2d 745 (7th Cir.1977); *Aldens, Inc. v. Packel*, 524 F.2d 38 (3d Cir.1975).

12. *See Flood v. Kuhn*, 407 U.S. 258, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972) (challenge to baseball's reserve clause regulating player movement among clubs); *Robertson v. National Basketball Ass'n*, 389 F.Supp. 867 (S.D.N.Y.1975)

(state antitrust laws inapplicable to national basketball league); *Partee v. San Diego Chargers Football Co.*, 34 Cal.3d 378, 668 P.2d 674, 194 Cal.Rptr. 367 (1983) (state antitrust laws inapplicable to national football league); *HMC Management Corp. v. New Orleans Basketball Club*, 375 So.2d 700 (La.Ct.App.1979) (state antitrust laws inapplicable to national basketball league team); *Matuszak v. Houston Oilers, Inc.*, 515 S.W.2d 725 (Tex.Ct.Civ.App.1974) (state antitrust laws inapplicable to national football league).

13. The leagues with the most teams are Major League Baseball, with 26 and plans for expanding soon to 28, the National Football League with 28, and the National Basketball Association with 27.

that uniformity is unnecessary to a shared ATM network's survival. Plus's argument is more a jealous defense of its own particular rules and its own concept of how it wants to do business than a serious attack on SB 404's chilling effect on interstate commerce. The commerce clause does not prevent states from taking action that may be inconsistent with Plus's concept of business efficiency; the Constitution does not protect any particular economic structure or approach. *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 127, 98 S.Ct. 2207, 2214–15, 57 L.Ed.2d 91 (1978) (commerce clause does not protect "the particular structure or methods of operation in a retail market"). In particular, the commerce clause does not give an interstate business the right to conduct its business in what it considers the most efficient manner; the Constitution "protects the interstate market, not particular interstate firms." *Id.* at 127–28, 98 S.Ct. at 2214–15.

### B. *Discrimination.*

■ Plus also alleges that SB 404 discriminates against interstate commerce, that Nevada is guilty of economic protectionism. Discrimination against interstate commerce is, as already noted, a per se violation of the commerce clause. Plus asserts that Nevada's purpose is to help its banks profit from out-of-state tourists' need for cash to participate in Nevada's gaming industry. Plus asserts that SB 404 discriminates against out-of-state withdrawal *customers* as well as favors Nevada *banks* at the expense of out-of-state Plus member banks. We can agree with neither Plus's legal nor their factual conclusions on the discrimination allegation.

Supreme Court authority strongly supports a finding of nondiscrimination. In *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 87–88, 107 S.Ct. 1637, 1648–49, 95 L.Ed.2d 67 (1987), the Court considered a discrimination-based challenge to an Indiana takeover act that applied only to corporations chartered in Indiana with a threshold number of Indiana shares or shareholders. Dynamics Corporation, the

appellee, claimed that the Act discriminated by applying "most often to out-of-state entities." *Id.* at 88, 107 S.Ct. at 1649. Dynamics assumed "that, as a practical matter, most hostile tender offers are launched by offerors outside Indiana." *Id.* The Court asserted, however, that a state law is not "discriminatory" under the commerce clause simply because it applies most often to out-of-staters. *Id.; see also Exxon Corp.*, 437 U.S. at 126, 98 S.Ct. at 2214. The Indiana Act had the same effect on tender offers regardless of the offeror's citizenship. *CTS Corp.*, 481 U.S. at 87–88, 107 S.Ct. at 1648–49. Under *CTS*, even a disproportionate effect on out-of-state residents and banks by the Nevada Act does not necessarily violate the commerce clause.

An Act that applies evenhandedly certainly passes muster under the commerce clause. SB 404 on its face does not distinguish between Nevada and out-of-state ATM customers, nor does it exempt Nevada banks from other Nevada banks' transaction fees. Its provisions affect foreign banks and foreign bank cardholders equally, whether from Nevada or not. Any foreign bank ATM cardholder pays a transaction fee imposed at a Valley bank's off-premises machines to receive cash, whether the foreign bank is a Nevada or non-Nevada bank, whether the cardholder is from Nevada or not. A Nevadan who banks at First Interstate Bank in Nevada pays the fee at Valley's casino ATMs, just as the California-resident, Bank of America cardholder does. The statute also does not exempt Nevada shared ATM networks. Any provision in In–Nevada's network agreement prohibiting member banks from charging transaction fees would not be enforceable in Nevada.[14]

Plus alleges that in practice SB 404 affects out-of-staters disproportionately to Nevadans, but Plus provides no factual support for this assertion. Plus's statement that SB 404's disproportionate impact is "beyond dispute" is not enough to create a genuine factual issue on its claim that SB 404's evenhandedness is superficial only.

---

**14.** In reality, In–Nevada does not prohibit member banks from charging transaction fees.

Furthermore, Valley offered evidence that the impact was *not* disproportionate. Valley extends its transaction fee policy beyond withdrawals processed by a national ATM network; it also charges a transaction fee to cardholders whose banks are members of the In–Nevada network, all Nevada banks save one. The financial impact on Nevada residents and banks of the In–Nevada transaction fee is not minute; in 1988, Valley processed more than 800,000 In–Nevada transactions. The district court did not clearly err in finding that Plus adduced no evidence to counter Valley's showing that the Act's impact is not disproportionate.

■ SB 404 functions only to allow acquirer banks to charge transaction fees to foreign cardholders at off-premises ATMs. It does not cover "foreign fees," charged by issuing banks to their own cardholders at off-premises ATMs.[15] Nevada banks were not restricted from charging foreign fees to their own account holders prior to SB 404. Plus itself permits member banks to charge such fees, and the practice is common among its banks. The Nevada legislature apparently saw no need, therefore, to speak to those fees in SB 404. Plus nevertheless complains that Valley discriminates in favor of its own cardholders by not charging them a foreign fee at off-premises ATMs while charging foreign cardholders a transaction fee at off-premises ATMs. Such a practice by one bank on a matter not covered by SB 404 does not persuade us that SB 404 violates the commerce clause. A bank legitimately may impose different fees on its own account holders than it imposes on non-account-holders using its services.[16] Additionally, by focusing on off-premises ATMs, Plus ignores Valley's consideration for foreign cardholders at its on-premises ATMs. Although permitted by SB 404, Valley does not charge foreign cardholders a transaction fee at its on-premises ATMs. Non–Valley cardholders can avoid the off-premises transaction fee by going to a Valley branch ATM.

Plus further argues that SB 404 favors Nevada banks by letting them have part of out-of-state banks' share of the ATM fee pie. Plus assumes that "ATM pricing is a type of 'zero sum game'—that is, if the ATM-deploying bank receives more, then the card-issuing bank must get less." Appellee's Opening Brief at 28. Plus has offered only its own application of economic theory but no facts to support its argument that its non-Nevada banks will lose business if its Nevada banks charge a transaction fee. Valley, on the other hand, offered evidence to the district court that foreign banks would not suffer from the transaction fee: the In–Nevada network's volume has risen rapidly although Valley charges a transaction fee to its users; customers who pay the transaction fees do not react adversely to them; other banks have not altered their own fee structures because of the transaction fees.

Plus failed to show that a genuine issue of material fact exists on their claim that SB 404 favors Nevada and discriminates against out-of-state customers, banks, or networks. The district court did not err in concluding that SB 404 does not per se violate the commerce clause by discriminating against interstate commerce.

## II. BALANCING INQUIRY

■ Under the "balancing" approach, a court must identify the state's interests in its legislation, ensure that they are legitimate, and then determine whether the state law imposes an excessive burden on interstate commerce in relation to those legitimate interests. *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970).

---

**15.** We reiterate the distinction between a foreign fee, charged by the issuing bank to its own cardholders when they withdraw cash from a foreign bank's ATM, and a transaction fee, charged by an acquirer bank to a foreign cardholder. Foreign and transaction fees are two types of fees that may be charged in a foreign transaction.

**16.** Plus ignores its own similar but less justifiable bias: by allowing foreign fees while prohibiting transaction fees, it favors issuing banks against acquirer banks.

## A. *Legitimate State Interests*

Valley cites four "legitimate state interests" supporting SB 404: regulating banking, increasing ATM deployment, facilitating tourism, and promoting competition.[17] Plus claims that each of these interests is pretextual.

■ States have a legitimate interest in regulating banking. *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 38, 100 S.Ct. 2009, 2016, 64 L.Ed.2d 702 (1980); *Sears, Roebuck & Co. v. Brown*, 806 F.2d 399, 409 (2d Cir.1986). The D.C. Circuit has held that in at least one banking context national banks must adhere to state rules: they must obey state branch banking rules in establishing off-premises electronic terminals. *Independent Bankers Ass'n v. Smith*, 534 F.2d 921 (D.C.Cir.1976). Congress specifically has declined to restrict state regulation in the ATM context. Congress intended the Electronic Fund Transfer Act, 15 U.S.C. §§ 1693–1693r,

> to eliminate minute deviations in State EFT [electronic funds transfer] laws and thereby foster the development of national standards, while also permitting the States to enact legislation affording greater consumer protection. While annulling all State EFT laws would produce the benefit of uniform EFT standards in all 50 States, the committee rejected this approach because it would contravene Congress' longstanding policy of deferring to those States which choose to pro-

vide more stringent consumer safeguards.

S.Rep. No. 915, 95th Cong., 2d Sess. 18, *reprinted in* 1978 U.S.Code Cong. & Admin.News 9273, 9403, 9420. A bill proposing to preempt state regulation of shared ATMs never reached the floor. *See* S. 2293, 95th Cong., 1st Sess., 123 Cong.Rec. 37,234–36 (1977).

■ Nevada, like other states, has actively regulated banking within its borders.[18] Its ATM statute is consistent with that approach and promotes a legitimate interest in accord with congressional policy on respecting state banking regulation.

The limited legislative history suggests the other purposes for SB 404: enabling Nevada banks to deploy more ATM machines in remote areas of Nevada and at off-premises sites for consumer convenience,[19] to benefit Nevada's gaming and tourism industries through the increased customer convenience,[20] and to promote competition among ATMs.[21] Nevada has sought in other banking regulation as well to expand customer access to banking services, *see* Nev.Rev.Stat. § 660.025 (1989) (authorizing use of banking "service centers"), permissible under a state's regulatory power over banking. We have held that Nevada's promotion of tourism is a legitimate state objective under an equal protection analysis. *Morris v. Hotel Riviera, Inc.*, 704 F.2d 1113, 1114 (9th Cir. 1983). Nevada has also sought in other legislation to promote competition, Nev.

---

**17.** Valley cites a fifth interest, consumer protection, that supports SB 404's disclosure provisions. Plus has not challenged that element of the Act.

**18.** *See, e.g.,* Nev.Rev.Stat. § 660.025 (1989) (authorizing use of banking "service centers"); *id.* § 662.065 (restricting bank investments in private securities); *id.* § 662.215(3) (requiring notice of rules governing passbook accounts); *id.* § 666.035(2) (restricting bank mergers that would lessen competition); *id.* § 666.355 (forced sale or merger of failing institution to protect its depositors, creditors, and other customers).

**19.** *E.g.,* Written Testimony of Jon Joseph in Favor of S.B. 404, Senate Commerce Committee, at 2 (May 26, 1989) [hereinafter Joseph Senate Testimony]; Written Testimony of Jon

Joseph in Favor of S.B. 404, Assembly Comm. on Commerce and Labor, at 2 (June 7, 1989) [hereinafter Joseph Assembly Testimony]; Transcript of Hearing on ATMs in Casinos, and Other Matters, Senate Commerce and Labor Comm., at 7 (May 26, 1989) (statement of Jon Joseph) [hereinafter Senate Transcript].

**20.** *E.g.,* Joseph Senate Testimony at 6; Joseph Assembly Testimony at 6; Senate Transcript at 6–7.

**21.** Joseph Senate Testimony at 3–4; Joseph Assembly Testimony at 3–4. Most of the legislative history consists of testimony by Jon Joseph, a Valley officer, admittedly not a source for the legislature's views. The committee members, who did question Joseph and comment on his testimony, indicated no disagreement with the purposes cited in that testimony.

Rev.Stat. § 598A.030 (1989) (Unfair Trade Practice Act), a legitimate state regulatory object, *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 495, 69 S.Ct. 684, 687, 93 L.Ed. 834 (1949).

SB 404 advances these legitimate state interests. The increased revenue from the transaction fees will compensate for lower volume at off-premises sites and promote additional deployment of machines. Greater deployment will benefit Nevada residents in the more remote areas of Nevada's geographical expanse and also tourists who want access to cash at all hours of the day. Although the transaction fee will probably result in a higher cost to the consumer per transaction, competition among banks, theoretically at least, will keep the cost down. ATMs from different banks already appear side by side in some casinos. The cost to the consumer of withdrawing money from ATMs, considering the added convenience of more machines, may be lower than other alternatives. That 96% of consumers responding to a Valley-conducted survey were willing to pay the added transaction fee indicates they consider the added convenience worth the added cost. Plus offered no evidence indicating otherwise.

 Plus charges that the purposes given for SB 404 are pretextual. It claims that the bill was enacted only to permit Valley to escape Plus's no-transaction-fee rule. The burden is on Plus to support its claim.

Plus asserts that statements plucked out of the legislative history, showing the legislators' concern that Valley's own customers not have to pay the transaction fee, unveil Nevada's pretext. The relevant statements are from testimony by Jon Joseph, a Valley officer:

I also would like to emphasize that there is absolutely no charge at any of our branch locations for our customers or any other customer that belongs to any network.... [A]nyone, whether they're a member of Plus or the Star network out of California or American Express or Discover or any other network, if they come to one of our branches will not pay the charge.

Oral Testimony of Jon Joseph, Assembly Commerce Comm., at 2 (June 7, 1989). Referring to Plus's rejection of Valley's study indicating that consumers were willing to pay the transaction fee, Joseph said:

The second thing we heard from all these out-of-state banks is that Nevada is different. You can't prove anything by tests in Nevada because people in Nevada aren't typical consumers. Well to that we say bunk. It's their customers in our casinos paying the charge and, you know, maybe we are a little bit different; maybe we have the ability to market this here because our principal industry, gaming, requires cash as its inventory. Without cash in those casinos, you don't have gaming play. And so we feel that we need to have the right to price for this service on an open market basis.

*Id.* at 3. Plus interprets this statement as referring to non-Nevada residents while ignoring its context—Joseph was pointing out that the people responding to Valley's survey were not just Nevada residents. The committee chairman, responding to a committee member's complaint about being charged a foreign fee (not a transaction fee), stated:

I did talk to [a Valley officer] earlier and they are willing to submit a letter to the Committee assuring us that they do not plan on charging their customers for the use of these machines.

*Id.* at 4.

Although these statements are minor when read in the context of Joseph's much more extensive remarks, they do indicate that Nevada legislators did not want to hurt their own constituents with SB 404. The legislators show less concern for out-of-staters. This predictable concern for Nevada residents does not rebut the even-handedness of the legislation's plain language.

 Plus argues also that if Nevada really wanted to encourage more ATM deployment rather than helping banks take the tourists' money, it would have written SB 404 differently. Plus says that SB 404

does not ensure greater ATM deployment because it does not require Nevada banks to spend the transaction fees on ATM deployment. Plus's accusation is true of many statutes intended to make funds available for specific purposes. Plus also argues that the legislature could have *required* the bank to impose a specific charge on all ATMs or all off-premises ATMs. Even if the statute be not immaculately tailored to the legislature's stated goals, however, poor drafting does not necessarily indicate pretext. Unwise legislation does not constitute a commerce clause violation. *CTS Corp.*, 481 U.S. at 92, 107 S.Ct. at 1651; *Exxon Corp.*, 437 U.S. at 126, 98 S.Ct. at 2214. It is enough that SB 404 is rationally related to Nevada's purposes in enacting it.

 Finally, Plus claims that a legislative history composed mostly of a Valley officer's testimony shows pretext. That a private entity agrees with the state's legitimate purposes and even provided the impetus for the legislation does not necessarily make the purposes pretextual. Nevada's claimed interests in passing the Act are legitimate and are actually promoted by the Act's terms. The record contains no evidence in support of Plus's allegation that the legislature was pursuing other illicit, underlying interests in passing SB 404.

### B. *Burden on Interstate Commerce*

Plus says that even if Nevada's legitimate state interests in passing the legislation are not pretextual, the burden on interstate commerce is excessive in relation to those interests. The burden on interstate commerce, as explained in the direct regulation and discrimination sections, is not great in relation to Nevada's interests; it is incidental. Plus in particular can continue operating as always, with the lone exception that the no-transaction-fee rule is unenforceable in Nevada. States have great freedom to regulate their banking industries because such regulation generally does not overburden interstate commerce. Plus has not demonstrated that SB 404 is any different, and other shared ATM networks have flourished despite allowing member banks to charge transaction fees.

### CONCLUSION

Viewing the facts most favorably to the nonmoving party, SB 404 does not violate the commerce clause. SB 404 constitutes neither direct regulation of interstate commerce, discrimination against interstate commerce, nor an undue burden on interstate commerce in light of Nevada's interests in enacting it. We affirm the district court's grant of summary judgment in favor of Valley.