**VALERIA G., et al., Plaintiffs,**

v.

**Pete WILSON, et al., Defendants.**

**No. C–98–2252–CAL.**

United States District Court, N.D. California.

July 15, 1998.

John Affeldt, Mark Savage, Martha I. Jim-énez, Public Advocates, Inc., San Francisco, CA, Edward M. Chen, ACLU Foundation of Northern California, San Francisco, CA, Christopher Ho, Joannie C. Chang, Marielena Hincapié, Employment Law Center, San Francisco, CA, Mark D. Rosenbaum, Rocio L. Cordoba, of counsel, ACLU Foundation of Southern California, Los Angeles, CA, Stewart Kwoh, Julie Su, Bonnie Tang, Asian Pacific American Legal Center, Los Angeles, CA, Lora Jo Foo, Frank Tse, Asian Law Caucus, Inc., San Francisco, CA, Antonia Hernández, Theresa Fay–Bustillos, Thomas Saenz, Silvia Argueta, Maribel S. Medina, Mexican American Legal Defense and Educational Fund, Los Angeles, CA, Joseph Jaramillo, Mexican American Legal Defense and Educational Fund, San Francisco, CA, Peter D. Roos, Deborah Escobedo, Multicultural Education, Training and Advocacy, Inc., San Francisco, CA, for Plaintiffs.

John H. Sugiyama, CA State Atty General's Office, San Francisco, CA, Sharon L. Browne, Pacific Legal Foundation, Sacramento, CA, Michael E. Hersher, California Department of Education, Sacramento, CA, for Defendants.

J. Scott Detamore, Todd Welch, William Pendley, Mountain States Legal Foundation, Denver, CO, G. Michael German, San Francisco, CA, Peter Simshauser, Carl Alan Roth, Ayaz Shaikh, Los Angeles, CA, Manuel S. Klausner, Los Angeles, CA (Robert P. Pongetti, Paul M. Eckles, Los Angeles, CA, of counsel), for Intervenors.

Cynthia L. Rice, California Rural Legal Assistance Foundation Labor and Civil Rights Litigation Project, San Francisco, CA, for Amicus Curiae Marivel Almanza, et al.

George Waters, N. Eugene Hill, Abhas Hajela, Olson, Hagel, Leidigh, Waters & Fishburn, LLP, Sacramento, CA, for Amicus Curiae Education Legal Alliance Of The California School Boards Association.

Colleen Rohan, Oakland, CA, for Amicus Curiae Meiklejohn Civil Liberties Institute.

Vilma S. Martinez, Bradley S. Phillips, Munger, Tolles & Olson LLP, Los Angeles, CA, Hojoon Hwang, Munger, Tolles & Olson LLP, San Francisco, CA, Richard K. Mason, Los Angeles Unified School District, Los Angeles, CA, for Amicus Curiae Los Angeles Unified School District.

## ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

LEGGE, District Judge.

### TABLE OF CONTENTS

Page No.

I. INTRODUCTION ............................................... 1012

II. THE INITIATIVE ............................................. 1012

III. PRELIMINARY INJUNCTION STANDARD ............................ 1014

IV. PRELIMINARY OBSERVATIONS ....................................... 1014

V. LIKELIHOOD OF SUCCESS ON THE MERITS .......................... 1015

VI. RIPENESS AND STANDING ......................................... 1015

VII. EQUAL EDUCATIONAL OPPORTUNITIES ACT ......................... 1016

VIII. SUPREMACY CLAUSE ............................................ 1021

IX. TITLE VI OF THE CIVIL RIGHTS ACT ............................. 1022

X. EQUAL PROTECTION CLAUSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1023

XI. TIME FOR IMPLEMENTATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1025

XII. RIPENESS REVISITED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1026

XIII. IRREPARABLE INJURY AND PUBLIC INTEREST . . . . . . . . . . . . . . . . . . . . . 1027

XIV. OTHER ARGUMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1027

XV. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1027

## I. INTRODUCTION

On June 2, 1998 the voters of California approved Proposition 227, an initiative statute entitled "English Language in Public Schools." The statute amends the California Education Code to change the system under which students who are limited in English proficiency are educated in California's public schools. On June 3, 1998 plaintiffs filed this action challenging Proposition 227 under federal statutes and the United States Constitution.

Plaintiffs now move for a preliminary injunction "enjoining defendants from implementing Proposition 227" pending the trial of this case.[1] Plaintiffs are several limited English proficient (called by the parties "LEP") students enrolled in California public schools. Five organizations have filed *amicus curie* briefs in support of the motion for a preliminary injunction.[2]

The motion is opposed by defendants: Governor Pete Wilson, the State Board of Education and its members, and the State Superintendent of Public Instruction Delaine Eastin. The motion is also opposed by several parties who have intervened in this lawsuit.[3]

This court has studied the moving brief, the briefs in opposition to the motion, the reply briefs, and the *amicus curie* briefs. It has also considered the declarations and exhibits submitted in support of the parties' positions.

For the reasons discussed below, the court will not enjoin the implementation of Proposition 227.

## II. THE INITIATIVE

The California electorate approved Proposition 227 by a margin of 61% to 39%. The general thrust of the initiative is to reject the bilingual education programs presently in effect in California public schools. Bilingual education programs are those in which LEP students, while they are learning English, receive instruction in academic subjects such as math, science and social studies in their "primary" or "home" language. The initiative replaces the bilingual education programs with an educational system designed to teach LEP students English, and other subjects in English, early in their education.

Proposition 227 is premised upon certain findings and declarations that include:

> The public schools of California currently do a poor job of educating immigrant children, wasting financial resources on costly experimental language programs whose failure over the past two decades is demonstrated by the current high drop-out rates and low English literacy levels of many immigrant children.

1. Plaintiffs have also moved for class certification, but that motion is not addressed in this order.

2. These organizations include: (i) Los Angeles Unified School District; (ii) Education Legal Alliance of California School Boards Association; (iii) parents of migratory LEP students, represented by the California Rural Legal Assistance Foundation; (iv) Meiklejohn Civil Liberties Institute; and (v) the San Francisco Bay Area chapter of the National Lawyers Guild.

3. Intervenors include: (i) *One Nation/One California*, a corporation formed by Mr. Ron Unz, a co-author of Proposition 227; (ii) Ms. Gloria Matta Tuchman, the other co-author; (iii) Las Familias del Pueblo; (iv) several LEP students enrolled in California public schools; and (v) the Center for Equal Opportunity.

Initiative, § 300(d). The findings also declare that English is "the language of economic opportunity" and that "[i]mmigrant parents are eager to have their children acquire a good knowledge of English, thereby allowing them to fully participate in the American Dream of economic and social advancement." *Id.* at §§ 300(a) & (b). The findings further state that "[t]he government and the public schools of California have a moral obligation and a constitutional duty to provide all of California's children, regardless of their ethnicity or national origins, with the skills necessary to become productive members of our society, and of these skills, literacy in the English language is among the most important." *Id.* at § 300(c).

In response to those defined problems and goals, Proposition 227 requires that LEP children receive instruction pursuant to an educational system known as "sheltered English immersion" or "structured English immersion." *Id.* at § 305. Under this system, children "shall be taught English by being taught in English." *Id.* The initiative requires that "Children who are English learners shall be educated through sheltered English immersion during a temporary transition period not normally intended to exceed one year." *Id.* "Once English learners have acquired a good working knowledge of English, they shall be transferred to English language mainstream classrooms." *Id.*

The initiative defines the immersion system as "an English language acquisition process for young children in which nearly all classroom instruction is in English but with the curriculum and presentation designed for children who are learning the language." *Id.* at § 306(d). It provides that "[l]ocal schools shall be permitted to place in the same classroom English learners of different ages but whose degree of English proficiency is similar." *Id.* at § 305.

Beyond this, the language of the initiative does not set forth a specific program or curriculum. It is not the function of this court to interpret all of the language of the initiative in this motion, but some things are apparent from the face of the statute.[4] Although the immersion program is "not normally intended to exceed one year," the initiative does not require a student to transition to mainstream classes until he or she has achieved a "good working knowledge of English." Also, the initiative on its face does not preclude the occasional use of an LEP student's primary language in the classroom, or outside of the classroom, such as by tutors, teacher's aids or other academic support programs. Nor does the initiative prohibit additional primary language assistance after an LEP child transitions into a mainstream classroom.

The initiative also sets forth several circumstances under which LEP children may receive waivers from English immersion, and "may be transferred to classes where they are taught English and other subjects through bilingual education techniques or other generally recognized educational methodologies permitted by law." *Id.* at § 310. Waivers may be granted (i) where a student already knows English; (ii) where the student is ten years or older and the school agrees that an alternative course of study would be a better way for the student to learn English; and (iii) where the student has tried the immersion program for at least thirty days and the school agrees that in light of his or her particular needs an alternative course of educational study would be better suited to the student's overall educational development. *Id.* at § 311. In all of these circumstances, a waiver may be granted only with parental consent. *Id.* at § 310.

Moreover, "[i]ndividual schools in which 20 pupils of a given grade level receive a waiver shall be *required* to offer" a class in which children are taught English and other subjects through bilingual or other alternative educational techniques. *Id.* (emphasis added).

---

4. The United States Supreme Court has stated that federal courts must extend a high degree of deference to the states in matters dealing with statutory interpretation of state laws. *Arizonans for Official English v. Arizona,* 520 U.S. 43, 117 S.Ct. 1055, 1072–75, 137 L.Ed.2d 170 (1997).

The briefing on this motion has suggested potential interpretations and ambiguities for perhaps later resolution. But neither side has suggested abstention, stay, or any other procedure to have the California state courts rule first on the interpretation of this initiative.

The initiative also appropriates from the state's General Fund fifty million dollars per year for each of the next ten years "for the purpose of providing additional funding for free or subsidized programs of adult English language instruction to parents or other members of the community who pledge to provide personal English language tutoring to California school children with limited English proficiency." *Id.* at § 315.

Anticipating a legal challenge, the initiative provides that

[i]f any part or parts of this statute are found to be in conflict with federal law or the United States or the California State Constitution, the statute shall be implemented to the maximum extent that federal law, and the United States and the California State Constitution permit. Any provision held invalid shall be severed from the remaining portions of this statute.

*Id.* at § 325.

The initiative becomes operative for school terms which begin sixty days after the date of its passage, June 2, 1998. *Id.* at § 330. Thus, if it survives plaintiffs' request for an injunction, the initiative will take effect in California public schools in the fall term of this year.

Finally, as will be discussed in more detail below, the initiative restricts the circumstances under which it may be amended:

The provisions of this act may be amended by a statute that becomes effective upon approval by the electorate or by a statute to further the act's purpose passed by a two-thirds vote of each house of the Legislature and signed by the Governor.

*Id.* at § 335.

### III. PRELIMINARY INJUNCTION STANDARD

■ A preliminary injunction may issue "if the movant has shown either a likelihood of success on the merits and the possibility of irreparable injury, or that serious questions are raised and the balance of hardships tips sharply in the movant's favor." *Coalition for Economic Equity v. Wilson,* 122 F.3d 692, 700 (1997) (quoting *Armstrong v. Mazurek,* 94 F.3d 566, 567 (9th Cir.1996)). *See also U.S. v. Odessa Union Warehouse Co-op,* 833

F.2d 172, 174 (9th Cir.1987) ("These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases"). In cases involving matters of significant public interest, such as the one now before this court, the court must also consider whether the public interest weighs in favor of the preliminary injunction.

Thus, under the "traditional test" typically used in cases involving the public interest, the district court should consider (1) the likelihood that the moving party will prevail on the merits, (2) whether the balance of irreparable harm favors the plaintiff, and (3) whether the public interest favors the moving party.

*Caribbean Marine Services Co., Inc. v. Baldrige,* 844 F.2d 668, 674 (9th Cir.1988). *See also Regents of University of California v. ABC, Inc.,* 747 F.2d 511, 514 & 521–22 (9th Cir.1984). The public interest in this case is reflected by the voters' overwhelming approval of Proposition 227.

### IV. PRELIMINARY OBSERVATIONS

Before proceeding to the legal issues raised by plaintiffs, the court makes three preliminary observations which concern principles important to the legal analysis:

First, the proponents and the opponents of Proposition 227 all share the *same objective:* to educate children who have limited English proficiency. Substantial state and local resources will be expended toward that common objective, regardless of which educational system will be used. The parties differ only on *how* to accomplish that common objective.

■ The second observation is related to the first. This court cannot discern from the face of Proposition 227 any hidden agenda of racial or national origin discrimination against any group. Because the educational debate and the initiative concern children whose primary language is not English, it necessarily focuses on children who are national origin minorities.[5] But the debate is a neutral one, about which system will provide LEP children with the best education to

---

5. The court notes that not all LEP students were born outside of the United States.

enable them to function as American citizens and enjoy the opportunities and privileges of life in the United States.

Third, each side has submitted extensive evidence and arguments, including research studies and sometimes vehement expert opinions, that their education system is the better one. There is a legitimate policy debate among respected educators and scholars on this issue. But, most important, that is not a debate for this court to resolve. This court is not a Supreme Board of Education. It is not the province of this court to impose on the people of California its view of which is the better education policy. The voters of California expressed their policy preference by enacting Proposition 227. The only decision this court can properly make is whether Proposition 227 violates any federal statute or the United States Constitution.

## V. LIKELIHOOD OF SUCCESS ON THE MERITS

Plaintiffs contend that they are likely to succeed on the merits of this suit because Proposition 227 violates (1) the Equal Educational Opportunities Act, (2) the Supremacy Clause of the United States Constitution, (3) Title VI of the Civil Rights Act, and (4) the Equal Protection Clause of the United States Constitution.

Plaintiffs' challenge to Proposition 227 is necessarily a *facial* challenge. Proposition 227 does not set forth a detailed educational plan or curriculum to be used by all school districts. The State Board of Education has not yet construed all of the initiative's various provisions or passed final regulations, guidelines, standards or curricula under it.[6] No local school district has yet implemented any specific curriculum or program. No child has yet entered a classroom under it. Thus, all this court can decide at this time is whether Proposition 227—on its face and in its present and as yet unapplied form—violates a federal statute or the United States Constitution.

■ "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *U.S. v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). The fact that Proposition 227 *might* in the future operate in violation of a federal law or the constitution under some· scenario is insufficient to render it facially invalid.

## VI. RIPENESS AND STANDING

Defendants contend that plaintiffs' claims are not yet "ripe" for judicial decision. The injuries of which plaintiffs complain, defendants contend, are speculative in that they have not yet occurred and may never occur. Before addressing each of plaintiffs' legal claims individually, it is appropriate to note the general requirements for ripeness and its related principle of standing.

■ The judicial power vested in the federal courts by Article III of the United States Constitution extends only to actual "cases" and "controversies." U.S. Const., Art. III, § 2. Among the "justiciability doctrines" developed by the courts to give meaning to Article III's case-or-controversy requirement are standing and ripeness. *National Treasury Employees Union v. U.S.,* 101 F.3d 1423 (D.C.Cir.1996).

■ The standing requirement focuses primarily on whether the parties bringing the lawsuit have a significant stake in the controversy. To have standing under Article III, a plaintiff must first have suffered an "injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." Second, the "injury in fact" must be "fairly traceable" to the challenged act. And third, it must be "likely" to be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

■ The ripeness requirement focuses on the timing of the lawsuit. To be "ripe," a lawsuit must be sufficiently well developed and specific to "be appropriate for judicial resolution." *Toilet Goods Ass'n, Inc. v. Gardner,* 387 U.S. 158, 162, 87 S.Ct. 1520, 18

---

6. The Board has begun that process. On July 9, 1998 the Board adopted Emergency Regulations and a suggested amendment to the policy for the use of funds from the Instructional Materials Fund.

L.Ed.2d 697 (1967). "Ripeness ... shares the constitutional requirement of standing that an injury in fact be certainly impending." *National Treasury Employees Union,* 101 F.3d at 1427. Courts may not decide cases that "involve[ ] uncertain and contingent future events that may not occur as anticipated, or indeed may not occur at all." *Metzenbaum v. Federal Energy Regulatory Commission,* 675 F.2d 1282, 1289 (D.C.Cir. 1982). The basic rationale of the ripeness doctrine

> is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.

*Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

■ Moreover, an issue is not ripe for federal court adjudication if a plaintiff has not applied for the benefits sought through available administrative channels. *Hodel v. Virginia Surface Mining & Reclamation. Ass'n, Inc.,* 452 U.S. 264, 297, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981) (facial challenge not ripe where plaintiffs have not "availed themselves of the opportunities provided by the Act to obtain administrative relief by requesting either a variance ... or a waiver from the ... restrictions"); *Christensen v. Yolo County Bd. of Sup'rs,* 995 F.2d 161, 164 (9th Cir. 1993) (claim not ripe where plaintiff has made no attempt to obtain benefit sought "through the procedures the State has provided for doing so before turning to the federal courts").

Plaintiffs here have not yet suffered and are not currently suffering any injury. No regulations [7] or programs have been adopted. And plaintiffs have not yet applied for the available waivers from the requirements of Proposition 227, which could eliminate their

alleged harm. The ripeness and standing issues thus turn on whether plaintiffs' alleged educational injuries under Proposition 227 are so inevitable and imminent that judicial intervention is appropriate now. With these principles in mind, the court addresses individually the legal violations alleged by plaintiffs.

## VII. EQUAL EDUCATIONAL OPPORTUNITIES ACT

■ Plaintiffs contend that Proposition 227 violates Section 1703(f) of Title 20 of the United States Code. Section 1703 was added by the Equal Educational Opportunities Act of 1974 ("EEOA"), codified at 20 U.S.C. § 1701, *et seq.* It provides:

> No state shall deny equal educational opportunity to an individual on account of his or her race, color, sex or national origin, by—

> . . . . .

> (f) the failure by an educational agency to take *appropriate action* to overcome language barriers that impede equal participation by its students in its instructional programs. (emphasis added.)

20 U.S.C. § 1703(f). This section imposes on states and educational agencies an obligation "to take appropriate action to overcome language barriers that impede equal participation by its students in its instructional programs." *Gomez v. Illinois State Board of Education,* 811 F.2d 1030, 1037 (7th Cir. 1987). *See also Idaho Migrant Council v. Board of Education,* 647 F.2d 69, 71 (9th Cir.1981).

■ The EEOA does not define what is "appropriate action," or provide criteria to evaluate whether a particular educational system constitutes "appropriate action." Nor does the "declaration of policy" underlying the EEOA, set forth in Section 1701, provide guidance as to whether any particular educational program constitutes "appropriate action." [8] The act does not even men-

---

**7.** Except the State Board's Emergency Regulations.

**8.** The "Congressional declaration of policy" provides:

> (a) *Entitlement to equal educational opportunity; neighborhood as appropriate basis*

The Congress declares it to be the policy of the United States that—
(1) all children enrolled in public schools are entitled to equal educational opportunity without regard to race, color, sex, or national origin; and

tion, much less mandate, bilingual education programs. Moreover, "Congress has provided us with almost no guidance, in the form of ... legislative history, to assist us in determining whether a school district's language remediation efforts are 'appropriate.'" *Castaneda v. Pickard,* 648 F.2d 989, 1009 (5th Cir.1981). Thus, to prove a violation of Section 1703(f) at this time, plaintiffs must establish that the implementation of Proposition 227 could not, in any circumstance, constitute "appropriate action" as required by the EEOA.

Judicial precedent is the only guidance available to this court. And the Ninth Circuit Court of Appeal has never addressed whether a particular educational system constitutes "appropriate action" under Section 1703(f). The leading circuit court decision on Section 1703(f) is *Castaneda v. Pickard, supra.* In *Castaneda,* plaintiffs claimed that bilingual education and language remediation programs that had previously been implemented in the defendant school district were in violation of the EEOA. *Id.* at 1006. Faced with little guidance from the statute, the policies stated in the statute, and the legislative history, the *Castaneda* court was, as this court is now,

> confronted with a type of task which federal courts are ill equipped to perform and which we are often criticized for undertaking prescribing substantive standards and policies for institutions whose governance is properly reserved to other levels and branches of our government (i.e., state and local educational agencies) which are better able to assimilate and assess the knowledge of professionals in the field.

*Id.,* at 1009.

The *Castaneda* court began its analysis by explaining that while Section 1703(f) requires educational agencies to take "appropriate action," it does not require a program of bilingual education.

> *We do not believe that· Congress,* at the time it adopted the EEOA, *intended to require local educational authorities to adopt any particular type of language*

*remediation program.* At the same time Congress enacted the EEOA, it passed the Bilingual Education Act of 1974, 20 U.S.C. § 880b *et seq.* (1976). The Bilingual Educational Act established a program of federal financial assistance intended to encourage local educational authorities to develop and implement bilingual education programs....

> We note that although Congress enacted both the Bilingual Education Act and the EEOA as part of the 1974 amendments to the Elementary and Secondary Education Act, *Congress, in describing the remedial obligation it sought to impose on the states in the EEOA, did not specify that a state must provide a program of "bilingual education"* to all limited English speaking students. We think Congress' use of the less specific term, "appropriate action," rather than "bilingual education," indicates that *Congress intended to leave state and local educational authorities a substantial amount of latitude in choosing the programs and techniques they would use to meet their obligations under the EEOA.*

*Id.,* at 1008–09 (emphasis added). *See also Guadalupe Organization, Inc. v. Tempe Elementary School Dist. No. 3,* 587 F.2d 1022, 1030 (9th Cir.1978). Because the EEOA does not *require* school districts to provide bilingual programs, the near elimination of bilingual education programs by Proposition 227 does not in and of itself violate Section 1703(f).

■■■ The *Castaneda* court recognized, however, that by obligating· schools to address the problem of language barriers, Congress intended to insure that schools make a genuine and good faith effort to remedy language deficiencies. *Castaneda,* 648 F.2d at 1009. The court devised a three-part test designed "to fulfill the responsibility Congress has assigned to us without unduly substituting our educational values and theories for the educational and political decisions reserved to state or local school authorities

---

(2) the neighborhood is the appropriate basis for determining public school assignments.
(b) *Purpose*
In order to carry out this policy, it is the purpose of this subchapter to specify appropri-

ate remedies for the orderly removal of the vestiges of the dual school system.
20 U.S.C. § 1701.

or the expert knowledge of educators." *Id.* For a particular language program to constitute "appropriate action" under section 1703(f), a court must ascertain (1) that a school "is pursuing a program informed by an educational theory recognized as sound by some experts in the field or, at least, deemed a legitimate experimental strategy"; (2) that the programs and practices actually used by a school are "reasonably calculated to implement effectively the educational theory adopted by the school"; and (3) that the program "produce[s] results indicating that the language barriers confronting students are actually being overcome." *Id.* at 1009–10. Using this framework to guide the analysis, the court now turns to plaintiffs' argument that the language program prescribed by Proposition 227 cannot be "appropriate action" under Section 1703(f).

## 1. *Sound Educational Theory*

 In the first step of the court's analysis

... the court must examine carefully the evidence the record contains concerning the soundness of the educational theory or principles upon which the challenged program is based. This, of course, is not to be done with any eye toward discerning the relative merits of sound but competing bodies of expert educational opinion, for choosing between sound but competing theories is properly left to the educators and public officials charged with responsibility for directing the educational policy of a school system. The state of the art in the area of language remediation may well be such that respected authorities legitimately differ as to the best type of educational program for limited English speaking students and we do not believe that Congress in enacting § 1703(f) intended to make the resolution of these differences the province of federal courts. *The court's responsibility, insofar as educational theory is concerned, is only to ascertain that a school system is pursing a program informed by an educational theory recognized as sound by some experts in the field or, at least, deemed a legitimate experimental strategy.*

*Id.* at 1009 (emphasis added).

Plaintiffs contend that Proposition 227 is based upon an unsound educational theory which is unprecedented, untested, and certain to irreparably harm LEP children. They provide expert opinions that a program of sheltered English immersion followed by mainstream classes in English is not a sound approach to educating LEP students. Plaintiffs' two major concerns are (1) that LEP students will be denied access to the substantive academic curriculum (*i.e.* math, science, social studies) while in language immersion class, which will lead to irremediable learning deficits; and (2) that most students with no prior knowledge of the English language cannot learn enough English in one year to compete on an equal footing with students in mainstream classes in English. Those are legitimate concerns, apparently supported by many experts in the field.

However, defendants present evidence that the sheltered English immersion program of Proposition 227 is also based upon a sound educational theory, which is not only tested but is the predominant method of teaching immigrant children in many countries in Western Europe, Canada and Israel. Defendants present expert opinions that "[t]he common European model is to put all newcomers into a special reception class for one year or, in rare cases two, and then to integrate them into regular classes, with ongoing extra support as needed." They also present evidence that "the advocates and political parties which are most concerned to do justice to immigrant minorities ... vigorously oppose assigning immigrant children to separate classes and teaching them in their home languages; seeing this as a well-meaning but ill-advised strategy leading inevitably to marginalization from the social and economic mainstream." Defendants further present evidence that numerous school districts in this country use structured English immersion methods.

Faced with this conflicting body of evidence, it is apparent that "the state of the art in the area of language remediation [is] such that respected authorities legitimately differ

as to the best type of educational program for limited English speaking students." *Castaneda*, 648 F.2d at 1009. This court's responsibility, however, is only to ascertain whether the theory underlying Proposition 227 is informed by an educational theory recognized as sound by some experts in the field or, at least is deemed a "legitimate experimental strategy." *Id.* In light of the evidence submitted, this court must conclude that the English immersion system is a valid educational theory. This court may not go beyond that conclusion and determine whether it is the better theory. It thus appears that Proposition 227 will satisfy the first prong of the *Castaneda* test.

Plaintiffs' central concern is that any programs implemented under Proposition 227 will sacrifice students' learning in academic subjects in favor of language instruction. Plaintiffs correctly point out that Section 1703(f) imposes the obligation to teach LEP students substantive curriculum as well as the English language. *Castaneda*, 648 F.2d at 1011 ("We understand § 1703(f) to impose on educational agencies not only an obligation to overcome the direct obstacles to learning that the language barrier itself poses, but also a duty to provide limited English speaking ability students with assistance in other areas of the curriculum where their equal participation may be impaired because of deficits incurred during participation in an agency's language remediation program.").

The court does not yet know how much substantive education will be taught in the immersion classes during the transition period. Although the initiative on its face does not *require* any particular curriculum, it also does not *prohibit* schools from implementing a curriculum designed to teach academic subjects to LEP students. This court may not assume, as plaintiffs do, "the outright absence of any program focused on academic achievement." The initiative leaves room for different educational choices, and this court can not conclude that no possible choice could constitute "appropriate action" under Section 1703(f).

Additionally, the court notes that requiring instruction which emphasizes language acquisition before full education in other areas of the curriculum does not *per se* violate Section 1703(f). This was specifically addressed by the *Castaneda* court:

[W]e do not think that a school system which provides limited English speaking students with a curriculum, during the early part of their school career, which has, as its primary objective, the development of literacy in English, has failed to fulfill its obligations under § 1703(f), even if the result of such a program is an interim sacrifice of learning in other areas during this period.... We believe the statute clearly contemplates that provision of a program placing primary emphasis on the development of English language skills would constitute "appropriate action."

\* \* \* \* \* \*

We also believe, however, that § 1703(f) leaves schools free to determine whether they wish to discharge these obligations simultaneously, by implementing a program designed to keep limited English speaking students at grade level in other areas of the curriculum by providing instruction in their native language at the same time that an English language development effort is pursued, or to address these problems in sequence, by focusing first on the development of English language skills and then later providing students with compensatory and supplemental education to remedy deficiencies in other areas which they may develop during this period. *In short, § 1703(f) leaves schools free to determine the sequence and manner in which limited English speaking students tackle this dual challenge so long as the schools design programs which are reasonably calculated to enable these students to attain parity of participation in the standard instructional program within a reasonable length of time after they enter the school system.* Therefore, we disagree with plaintiffs' assertion that a school system which chooses to focus first on English language development and later provides students with an intensive remedial program to help them catch up in other areas of the curriculum has failed to fulfill its statutory obligation under § 1703(f).

*Castaneda,* 648 F.2d at 1011–12 (emphasis added).

2. *Programs Calculated to Implement the Theory*

Under *Castaneda,*

[t]he court's second inquiry [is] whether the programs and practices actually used by a school system are reasonably calculated to implement effectively the educational theory adopted by the school. We do not believe that it may fairly be said that a school system is taking appropriate action to remedy language barriers if, despite the adoption of a promising theory, the system fails to follow through with practices, resources and personnel necessary to transform the theory into reality.

*Id.* at 1010. In *Castaneda,* unlike the present case, the plaintiffs challenged a program which had been in effect for a significant period of time. That court therefore analyzed whether certain specific programs and practices were reasonably calculated to implement effectively the educational theory adopted by the school district. Specifically, the court analyzed whether the school district's curriculum, staff qualifications, and testing methods were reasonably calculated to implement effectively the school's bilingual education program. *Id.* at 1010–15.

Because Proposition 227 has not yet been implemented, there are no programs or practices "actually used" in California schools for this court to analyze. Moreover, the thrust of plaintiffs' argument is not that no program could reasonably be calculated to implement the immersion system of Proposition 227. Rather, plaintiffs argue that no implementation *of that system* could ever overcome barriers that impede equal participation by LEP students.

First, plaintiffs argue that programs under Proposition 227 are inevitably doomed to failure because the initiative does not specify any mechanism by which to assess students' individual needs or evaluate students' individual progress. The court agrees that the effective implementation of the Proposition 227 system will require adequate methods to assess students' needs and progress. *See, e.g., Castaneda,* 648 F.2d at 1013–14. But nothing in Proposition 227 precludes the State Board of Education from requiring, or

local school districts from implementing, adequate methods of individual assessment and evaluation. And the waiver provisions specifically contemplate a system in which the needs of individual students are considered.

Plaintiffs next argue that even if adequate systems for need assessment are implemented, Proposition 227 imposes a "straight jacket" on schools which leaves them no flexibility to respond to deficiencies in their general LEP programs or provide programs specifically tailored to meet individual needs. This characterization of Proposition 227 as a "sink or swim" "one size fits all" "straight jacket" is overstated. The initiative leaves state and local education agencies with significant flexibility in how to design and implement programs which comply with its requirements. For example, Proposition 277 leaves the schools flexibility relating to when and how to grant waivers, how much and what type of academic support to provide LEP children outside of the classroom, how to balance the dual goals of language acquisition and substantive education, how to train teachers, how to define "good working knowledge of English," how to evaluate when LEP students have attained that level of knowledge, how long the English immersion will last, and what additional assistance may be added to the required programs. This court cannot conclude now that no programs could be implemented under Proposition 227 which will allow schools to respond to perceived shortcomings in their programs generally, or meet the needs of a particular student.

Plaintiffs also argue that Proposition 227 can not be adequately implemented under any circumstances, because it does not establish teaching standards or training requirements. Competent and adequately trained teachers are necessary for effective implementation of any educational theory. *See, e.g., Castaneda,* 648 F.2d at 1012. But again, it is premature for this court to make that analysis now. The State Board of Education and local school districts can establish appropriate teaching standards and training requirements. Nothing in the text of Proposition 227 precludes that.

The court finds that it is unlikely that there is no set of circumstances under which

California's schools can adopt programs reasonably calculated to implement the educational theory of Proposition 227.

### 3. *Results*

Finally, ... [i]f a school's program, although premised on a legitimate educational theory and implemented through the use of adequate techniques, fails, after being employed for a period of time sufficient to give the plan a legitimate trial, to produce results indicating that the language barriers confronting students are actually being overcome, that program may, at that point, no longer constitute appropriate action as far as that school is concerned. We do not believe Congress intended that under § 1703(f) a school would be free to persist in a policy which, although it may have been "appropriate" when adopted, in the sense that there were sound expectations for success and bona fide efforts to make the program work, has, in practice, proved a failure.

*Castaneda,* 648 F.2d at 1010.

Again, because Proposition 227 has not yet been implemented, there are not yet any "results" to evaluate. And there is nothing on the face of the initiative which compels the conclusion that California cannot later evaluate its results. Plaintiffs' arguments to the contrary are based upon their own assumptions about the end results, and they ignore the contrary body of educational opinion supporting the system adopted by Proposition 227.

### 4. *Conclusion Regarding EEOA*

The court must therefore conclude that plaintiffs have not shown a likelihood that Proposition 227 on its face violates the EEOA. The proposition is based on *an* educational theory that is supported by some experts and some actual experience. Until the State adopts a regulatory scheme and school districts actually implement programs pursuant to the initiative, it is unlikely that this court will have the facts necessary to resolve plaintiffs' claims under the EEOA— namely, whether those programs implement effectively the theory and whether those programs will actually work.

### VIII. SUPREMACY CLAUSE

Plaintiffs next contend that Proposition 227 violates the Supremacy Clause of the United States Constitution, Art. VI, Cl. 2, in two ways:

First, they argue that the initiative impedes the ability of school districts to comply with their obligations under the EEOA. The initiative, they argue, "bars school districts from utilizing the most obvious and generally accepted options available to meet the needs of LEP students—bilingual education...." As a result, plaintiffs argue, school districts cannot meet their dual obligations under the EEOA of both insuring English language development and preventing academic deficiencies.

Under the Supremacy Clause of the Constitution, "any state law ... which interferes with or is contrary to federal law, must yield." *Free v. Bland,* 369 U.S. 663, 666, 82 S.Ct. 1089, 8 L.Ed.2d 180 (1962) (citing *Gibbons v. Ogden,* 22 U.S. 1, 9 Wheat. 1, 210–211, 6 L.Ed. 23).

The criterion for determining whether state and federal laws are so inconsistent that the state law must give way is firmly established in our decisions. Our task is "to determine whether, under the circumstances of this particular case, [the State's] law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." [ ] This inquiry requires us to consider the relationship between state and federal laws as they are interpreted and applied, not merely as they are written.

*Jones v. Rath Packing Co.,* 430 U.S. 519, 526, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977) (internal citations omitted). In areas of coincident federal and state regulation, such as education, courts may not "seek[ ] out conflicts between state and federal regulation where none clearly exists." *Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 130, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978) (quoting *Huron Cement Co. v. Detroit,* 362 U.S. 440, 446, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960)).

As discussed above, the EEOA does not require bilingual education. *Castaneda,* 648 It therefore does not prohibit states

from denying bilingual education. And as also discussed above, this court cannot now determine that Proposition 227 violates the EEOA.

■ Plaintiffs next argue that the initiative violates the Supremacy Clause because it bars the "congressionally-favored option" of primary language instruction. They argue that Congress has expressed a preference for primary language instruction in the Bilingual Education Act of 1974, 20 U.S.C. § 7401, *et seq.*, which provides federal grant money to local school districts to develop bilingual programs. Plaintiffs are correct that the statements of "Findings," "Policy," and "Purpose" of the Bilingual Education Act suggest that Congress encouraged bilingual education programs. *See* 20 U.S.C. § 7402(a)–(c). Congress did so by offering financial assistance. But it did not *require* bilingual education. And the fact that Congress was aware of bilingual education suggests that Congress made a deliberate choice *not to mandate* such programs when it simultaneously enacted the EEOA, which requires only "appropriate action." Congress did not prohibit or otherwise discourage *other* educational programs for LEP students.

The court sees no conflict between Proposition 227 and the ability of school districts to comply with either the EEOA or the policies expressed in the Bilingual Education Act. Plaintiffs have not established a probability that Proposition 227 violates the Supremacy Clause of the United States Constitution.

## IX. TITLE VI OF THE CIVIL RIGHTS ACT

Plaintiffs next contend that Proposition 227 violates Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and its implementing regulations, 34 C.F.R. § 100.3(b)(2). Section 2000d provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. The regulations state that recipients of federal funding may not

utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination because of

their race, color, or national origin, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respect individuals of a particular race, color, or national origin.

34 C.F.R. 100.3(b)(2).

Plaintiffs argue that Proposition 227 violates Title VI because "it imposes an unjustifiable disparate impact on national origin minorities," "by denying LEP students meaningful access to academic curriculum during its 'sheltered English immersion' program, and then shunting them prematurely into mainstream academic classrooms," without providing "any remedial instruction to recoup the academic deficits incurred by them during that program."

■ A threshold issue is whether a showing of an adverse disparate *impact* is sufficient to establish a Title VI violation, or whether a showing of discriminatory *intent* is required. There appears to be some disagreement among the authorities on this issue.

In *Lau v. Nichols*, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974), the Supreme Court stated that "[d]iscrimination is barred which has that effect even though no purposeful design is present." *Id.* at 568, 94 S.Ct. 786. In that case, the Court held that a school district's failure to provide *any* language assistance to substantial numbers of non-English speaking students violated Title VI, because such failure denied LEP students "a meaningful opportunity to participate in the educational program." *Lau,* 414 U.S. at 568, 94 S.Ct. 786. In declaring such an omission unlawful, the Court did not mandate any particular program of assistance. Indeed, it noted that a school district might undertake any one of several permissible courses of language remediation:

Teaching English to the students of Chinese ancestry who do not speak the language is one choice. Giving instruction to this group in Chinese is another. There may be others.

*Id.* at 565, 94 S.Ct. 786.

Two years later, in *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), the Supreme Court held that a dis-

criminatory *purpose,* and not simply a disparate impact or effect, must be shown to establish a violation of the Equal Protection Clause. The Court then decided *Regents of University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), in which the Court interpreted Title VI, to be coextensive, at least for some purposes, with the Equal Protection Clause. A majority of Justices have interpreted these two cases to suggest that Title VI, like the Equal Protection Clause, is violated only by conduct motivated by an intent to discriminate and not by conduct which merely has a discriminatory effect. *See Guardians Ass'n v. Civil Service Com'n of New York,* 463 U.S. 582, 608 n. 1, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983); *Castaneda,* 648 F.2d at 1007.

The Ninth Circuit and a different majority of the Supreme Court, however, appear to have taken the position in recent opinions that where a lawsuit is brought to enforce the *regulations* under Title VI, rather than the statute itself, and where the plaintiffs seek injunctive or declaratory relief as opposed to compensatory relief, plaintiffs can prove a Title VI violation by establishing only a discriminatory effect. *See Guardians Ass'n,* 463 U.S. at 584, 602–03 & 608 n. 1, 103 S.Ct. 3221 (1983); *Larry P. v. Riles,* 793 F.2d 969, 981–82 (1984). Because plaintiffs here contend that Proposition 227 also violates Title VI's implementing regulations, and because they seek only injunctive and declaratory relief, it may be appropriate to use a discriminatory effect analysis.

 However, regardless of which standard applies, plaintiffs are not presently likely to succeed on the merits of their Title VI claim. Plaintiffs do not argue that Proposition 227 intentionally discriminates against LEP students, and as stated above, this court sees no evidence of discriminatory intent from the face of the initiative. Nor are plaintiffs likely to succeed on the merits even if a showing of adverse effect is sufficient. The initiative has not yet had any impact on anyone, and plaintiffs have not established that an adverse impact is inevitable. Plaintiffs advance their same arguments as in their EEOA claim, namely: most children will not learn enough English in one year to allow them to fully participate in mainstream classes; they will not have meaningful access to the academic curriculum during the immersion program; they will receive no remedial instruction to help recoup any academic deficits incurred during the immersion program; and they will receive no individualized assessment of needs or services. As discussed above, some of these contentions are debated by the experts in the field, and others are based on plaintiffs' assumptions about how Proposition 227 will operate. Proposition 227 on its face requires that *all* LEP students receive some kind of instruction designed to teach English and eliminate barriers to equal participation in the schools' instructional programs. Some experts in the field, as well as the California electorate, believe the initiative will have a beneficial rather than a detrimental effect on LEP students. And neither Title VI nor its regulations compel any particular method of education. This court cannot conclude from the face of Proposition 227 that it will inevitably result in an adverse effect, exclusion, denial of benefits, or discrimination.

## X. EQUAL PROTECTION CLAUSE

Plaintiffs finally argue that Proposition 227 violates the Equal Protection Clause of the federal constitution. That clause provides that "no state shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S.Constitution, Amend. XIV, § 1.

It is first important to note what plaintiffs do *not* argue in making their equal protection claim. They do *not* assert that the education system enacted by Proposition 227 is itself a violation of the equal protection clause. Indeed, there is at least one circuit case holding that there is no constitutional right to bilingual education. *Guadalupe Organization Inc. v. Tempe Elementary School Dist. No. 3,* 587 F.2d 1022, 1027 (9th Cir.1978).

Instead, plaintiffs argue that Section 335 of Proposition 227 has created a political structure which plaintiffs will be disadvantaged in attempting to modify. Their argument is based upon *Hunter v. Erickson,* 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969), and *Washington v. Seattle School Dist. No. 1,* 458 U.S. 457, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982). More specifically, plaintiffs argue

that Proposition 227 denies them the equal opportunity to secure future legislation for programs that will be beneficial to them. They argue that Proposition 227 elevates the decision making process to a higher level of government than would otherwise be required; that is, that Proposition 227 places higher burdens upon them in seeking future changes by the state legislature, the state Board of Education, and local school boards. The reason is that Section 335 provides that Proposition 227 can be amended only upon approval by the electorate, or by a statute passed by a two-thirds vote by each house of the legislature and signed by the governor. And plaintiffs argue that because the subject is the education of LEP children, which is of particular concern to minorities, it requires strict scrutiny. Plaintiffs emphasize that they do not raise a "conventional" equal protection claim, but one based upon the political structure which results from Section 335.

It is true that Proposition 227 goes further than most legislation which has reached the courts, in that it requires for its change either approval by the state's electorate or a two-thirds majority of the legislature. However, this court concludes that plaintiffs nevertheless do not show probable success on the merits that this is a violation of equal protection.

It is particularly significant that this same argument has recently been rejected by the Ninth circuit in *Coalition For Economic Equity v. Wilson*, 122 F.3d 692 (9th Cir.1997). That court considered the application of the *Hunter—Seattle* principle to the state initiative at issue in that case, and the plaintiffs there made essentially the same argument as plaintiffs here. The Ninth Circuit rejected that argument, despite the dissent of judges who believed that an *en banc* hearing should be granted. Among other things, the Ninth Circuit said as follows:

> The Hunter doctrine "does not mean, of course, that every attempt to address a racial issue gives rise to an impermissible classification." Rather, for the doctrine to apply at all, the state somehow must reallocate political authority in a discriminatory manner.
> States have "extraordinarily wide latitude ... in creating various types of political subdivisions and conferring authority upon

them." That a law resolves an issue at a higher level of state government says nothing in and of itself. Every statewide policy has the "procedural" effect of denying someone an inconsistent outcome at the local level. [A] law making procedure that 'disadvantages' a particular group does not always deny equal protection. Under any such holding, presumably a State would not be able to require referendums on any subject unless referendums were required on all, because they would always disadvantage some group.

*Coalition For Economic Equity*, 122 F.3d at 706 (citations omitted). The Ninth Circuit pointed out that the initiative before it in that case, as in this one, was not "an impediment to protection against unequal treatment but ... an impediment to receiving preferential treatment." *Id.* at 708. And "[i]mpediments to preferential treatment do not deny equal protection." *Id.*

In this case the impediment is to plaintiffs obtaining a bilingual education system. As stated, there is no constitutional right to bilingual education. And the Ninth Circuit said in *Coalition For Economic Equity v. Wilson* that the equal protection clause was not violated by the repeal of legislation or policies "that were not required by the Federal Constitution in the first place." *Id.* at 706. So stating, the Ninth Circuit was quoting from *Crawford v. Board of Educ. of the City of Los Angeles*, 458 U.S. 527, 102 S.Ct. 3211, 73 L.Ed.2d 948 (1982), decided at the same time as *Seattle*. The Supreme Court there said:

> We [reject] the contention that once a state chooses to do "more" than the Fourteenth Amendment requires, it may never recede. We reject an interpretation of the Fourteenth Amendment so destructive of a State's democratic processes and of its ability to experiment.

*Crawford*, 458 U.S. at 535, 102 S.Ct. 3211. The Supreme Court also repeated its holding "that the Equal Protection Clause is not violated by the mere repeal of race-related legislation or policies that were not required by the Federal Constitution in the first place." *Id.* at 538, 102 S.Ct. 3211. And, "[i]n short, having gone beyond the requirements

of the Federal Constitution, the State was free to return in part to the standard prevailing generally throughout the United States." *Id.* at 542, 102 S.Ct. 3211.

■ The same things may be said of this initiative. Since there is no requirement in the federal constitution for bilingual education, the voters of California were free to reject bilingual education. Were they also free to set higher requirements for a future repeal of English immersion education and a return to bilingual education? Or stated conversely, are plaintiffs' equal protection rights violated because it could be more difficult for them to get something to which they are not constitutionally entitled, bilingual education? While those questions are unanswered by *Crawford,* or indeed directly by *Hunter* and *Seattle,* this court believes that the starting presumption must be in favor of the right of California voters to impose upon themselves requirements that are applicable to all citizens.

■ Of course, the majority cannot impose a restriction upon the minority if there is intentional discrimination against the minority. But it is plaintiffs' burden to establish that intention. Plaintiffs decline to carry that burden, simply by saying that they are not arguing a "conventional" equal protection claim. However, the requirement of intent is not so easily discarded. The Supreme Court said in *Crawford,* at the same time as its *Seattle* decision: "[T]his court previously has held that even when a neutral law has a disproportionately adverse effect on a racial minority, the Fourteenth Amendment is violated only if a discriminatory purpose can be shown." *Id.* at 537–538, 102 S.Ct. 3211. And the Court again addressed the issue of discriminatory purpose in its opinion at 458 U.S. at 543–545, 102 S.Ct. 3211. So this court cannot so easily conclude that intentional discrimination is not a necessary element to plaintiffs' claims.

Addressing Proposition 227 more specifically, it does not appear from the face of the initiative that plaintiffs are in fact as burdened as their argument suggests. There are options to a future state-wide initiative campaign. Changes can be made by the legislature, albeit with two-thirds majority. There are also other options to, if not the outright repeal of Proposition 227, its impact

on particular school districts or on particular students. Plaintiffs can still petition the local school boards, and indeed the state school board, for regulations dealing with the implementation of Proposition 227 and exceptions thereto. Also a waiver system is built into Proposition 227. And, in the event of an actual deprivation of equal protection to an individual student, both the state and federal courts are available.

■ Finally, even if Section 335 of Proposition 227 does violate the equal protection clause, that alone would not entitle plaintiffs to an injunction restraining all of Proposition 227 from being put into effect. Section 325 specifically provides that if any part of the initiative is found to be in conflict with federal law, the statute shall be implemented to the maximum extent that federal law permits, and any invalid portion would be severed from the remaining portions. Thus, even if this or a higher court were later to hold that the amendment provisions of Section 335 violate the equal protection clause, it could be severable from the remainder of Proposition 227. Proposition 227 could therefore be implemented without the structural provision for its amendment which plaintiffs challenge.

Plaintiffs' challenge to this portion of Proposition 227 is certainly not frivolous. However, for the reasons stated, the court believes that plaintiffs have not demonstrated a sufficient likelihood of success on the merits of this claim to justify an injunction against implementing all of Proposition 227.

## XI. TIME FOR IMPLEMENTATION

Plaintiffs and certain *amicus curie* contend that Proposition 227 cannot adequately be implemented in the time remaining before the next school semester. They contend that immediate implementation will create administrative chaos and educational harm to LEP children, because more time is needed for the responsible agencies to issue regulations, develop and implement curricula, select text books, train teachers, assess students' language abilities, and coordinate class schedules.

Defendants present a record that the initiative can be adequately implemented in the

time remaining. The State Board of Education has already issued emergency regulations, taken steps for funding, and is considering waiver requests by school districts. Defendants also contend that school districts do not have to develop entirely new materials, because they can use text books and curricula that are already in use by some California schools. At least one major school district already has a contingency plan. Moreover, one group of intervenors argues that the students will be harmed more by postponing implementation, because the present bilingual education system is failing to adequately educate California's LEP children.

■ There is a difference of opinion about the adequacy of the time for implementation. Indeed, plaintiffs raise some substantial problems related to implementation. It might well be good educational policy to postpone the effective date of the initiative for one year, to provide more time for a smooth transition. But this policy question is not within the province of the court to decide. The question of adequate time for implementation does not raise any violation of federal law or the constitution. It is inevitable in any change that there will be some bureaucratic hardship, some loss of continuity, and some temporary hardships. But such harms cannot be said to be irreparable rather than interim.

## XII. RIPENESS REVISITED

■ In bringing a facial challenge to Proposition 227 the day after its enactment, plaintiffs ask this court to bar all implementation of the initiative in an *anticipatory* manner. At most, plaintiffs have shown that Proposition 227 is *capable* of operating in a manner that might violate federal statutes or the constitution. But such a showing is insufficient for a successful *facial* challenge to an unimplemented statute. *See Metzenbaum v. Federal Energy Regulatory Commission*, 675 F.2d 1282, 1289–90 (D.C.Cir.1982).

> It is axiomatic that a statute is not facially invalid simply because it is possible to contemplate circumstances in which the application of the statute could result in [violation of federal law] where there is no evidence to support the claim that the

terms of the statute in themselves produce that result.

*Id.* at 1289 (internal quotations and citations omitted). Courts regularly deny anticipatory review when further development by state officials may reduce or avoid constitutional problems, or change the nature of the issues presented. *See, e.g., Wheeler v. Barrera*, 417 U.S. 402, 426–27, 94 S.Ct. 2274, 41 L.Ed.2d 159 (1974) (constitutional issue not ripe until a specific plan is before the Court); *Young v. Klutznick*, 652 F.2d 617, 625–26 (6th Cir. 1981) (issue not ripe where anticipated injury would not occur until state officials acted, and might not occur at all). This is particularly so where relevant programs have not yet been adopted or applied.

> No one can foresee the varying applications of these separate provisions which conceivably might be made. A law which is constitutional as applied in one manner may still contravene the Constitution as applied in another. Since all contingencies of attempted enforcement cannot be envisioned in advance of those applications, courts have in the main found it wiser to delay passing upon the constitutionality of all the separate phases of a comprehensive statute until faced with cases involving particular provisions as specifically applied to persons who claim to be injured. Passing upon the possible significance of the manifold provision of a broad statute in advance of efforts to apply the separate provisions is analogous to rendering an advisory opinion upon a statute or a declaratory judgment upon a hypothetical case.

*Nixon v. Administrator of General Services*, 433 U.S. 425, 438, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977) (quoting *Watson v. Buck*, 313 U.S. 387, 402, 61 S.Ct. 962, 85 L.Ed. 1416 (1941)).

Because this challenge is similarly not ripe for adjudication on the merits, plaintiffs cannot now show that they are likely to succeed on their EEOA, Supremacy Clause, Title VI and Equal Protection claims. If the programs actually implemented under Proposition 227 violate federal laws or the constitution, plaintiffs can then initiate an "as-applied" challenge.

## XIII. IRREPARABLE INJURY AND PUBLIC INTEREST

██ "Under any formulation of the test [for preliminary injunctive relief], the moving party must demonstrate a significant threat of irreparable injury." *Arcamuzi v. Continental Air Lines, Inc.,* 819 F.2d 935, 937 (9th Cir.1987). Some LEP students will not receive their preferred instructional program, bilingual education, under Proposition 227. But all LEP students will receive instruction designed to teach English and reduce barriers to schools' instructional programs. At present the court is presented with the alleged differences between two educational theories, structured English immersion and bilingual education. The experts disagree over whether the implementation of Proposition 227 will *benefit* or *harm* LEP students. And the extent of any benefit or harm may well depend on specific programs actually implemented under the initiative. There is insufficient evidence to demonstrate that there will be harm, or that any actual harm would be irreparable.

██ Consideration of the public interest also favors the implementation of Proposition 227. "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *New Motor Vehicle Bd. of California v. Orrin W. Fox Co.,* 434 U.S. 1345, 1351, 98 S.Ct. 359, 54 L.Ed.2d 439 (1977) (Opinion in Chambers of Rehnquist, Circuit Justice). This reasoning applies even more strongly here, where the statute was enacted directly by the voters of the state. *See Coalition for Economic Equity v. Wilson,* 122 F.3d 692, 698, n. 4 (9th Cir.1997).

## XIV. OTHER ARGUMENTS

The intervenors and *amicus curie* have made numerous other arguments. The court need not discuss all of them, but will address a few.

The Frias intervenors argue that the present bilingual system in California is *itself* a violation of the constitution and federal law. The legality of California's bilingual education system, however, is not an issue raised by plaintiffs in their complaint or in this motion for preliminary injunction, and therefore need not be addressed here.

The *amicus curie* brief filed by the California Rural Legal Assistance Foundation, on behalf of migrant LEP students, argues that Proposition 227 will place special burdens upon them. They argue that because migrant children frequently change schools, their access to the core curriculum under Proposition 227 will become even more impaired, and that it will be difficult for their parents to be involved in their educations or to use the waiver process. However, these arguments really address the educational policy question as to which system of educating LEP children will work better for this group of children. And that question is not within the province of this court. Moreover, under the Proposition 227 system, migratory students still will receive the bilingual services and other benefits of the California Migrant Education Act and of federal funding.

The Meiklejohn Civil Liberties Institute makes several arguments which are not properly within the scope of this action or this motion for a preliminary injunction. There is no issue in this case of a violation of the United Nations Charter, the International Convention on the Elimination of All Forms of Racial Discrimination, or the International Covenant on Civil and Political Rights. Moreover, the brief of this *amicus* implies that Proposition 227 was motivated by racial or national origin discrimination. But as this court has already stated, the objective of both sides in this dispute is the same—to educate all LEP children. The debate is over how best to do that. This *amicus* also argues that teachers have an absolute First Amendment right to teach whatever they want in the classroom. This court does not believe that the scope of the First Amendment goes that far. Courses and methods of instruction can be and are governed by state and local school district regulations, without violation of the First Amendment rights of teachers.

## XV. CONCLUSION

For the reasons discussed above, the court concludes that plaintiffs are unable to sustain their burden for a preliminary injunction. The low probability of success on the merits,

the speculative nature of future harm, and the public's interest in passing their state's initiative all preclude a preliminary injunction.

IT IS THEREFORE ORDERED that plaintiffs' motion for a preliminary injunction is denied.