**S.D. MYERS, INC., Plaintiff–Appellant,**

v.

**CITY AND COUNTY OF SAN FRANCISCO and San Francisco Human Rights Commission, Defendants–Appellees.**

**No. 99–16397.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 14, 2000

Filed June 14, 2001

Kevin H. Theriot, Esq., American Center for Law and Justice, Lawrenceville, Georgia, for the plaintiff-appellant.

Dennis Aftergut, Chief Assistant City Attorney, Deputy City Attorneys, City Hall, San Francisco, California, for the defendants-appellees.

Matthew A. Coles, Esq., American Civil Liberties Union, New York, New York for the amicus.

Robert Kim, Esq., American Civil Liberties Union Foundation of California, San Francisco, California, for the amicus.

Jennifer C. Pizer, Esq., Lambda Legal Defense and Education Fund, Inc., Los Angeles, California, for the amicus.

Before: WALLACE, FISHER, and RAWLINSON, Circuit Judges.

WALLACE, Circuit Judge:

S.D. Myers, Inc. (Myers) appeals from a summary judgment in favor of the City and County of San Francisco (City). Myers argues that Chapter 12B of the San Francisco Administrative Code (Ordinance) is invalid under the dormant Commerce Clause, Due Process Clause, and California law. The Ordinance requires contractors with the City to provide non-discriminatory benefits to employees with registered domestic partners. Myers also asserts that the district court erred when it determined that Myers lacked standing to argue that the Ordinance is preempted by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001 *et seq.* The district court had jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1367. We have jurisdiction pursuant to 28 U.S.C. § 1291. We affirm, but remand for the district court's consideration an issue raised for the first time in this appeal.

I

For nearly thirty years, the City has pledged not to do business with entities that discriminate on the basis of sexual orientation. *See Air Transport Ass'n of America v. City & County of San Francisco*, 992 F.Supp. 1149, 1156–57 (N.D.Cal. 1998). In the spring of 1997, the City, in an effort to enhance that promise by add-ing concrete requirements, enacted the Ordinance, which provides as follows:

> No contracting agency of the City, or any department thereof, acting for or on behalf of the City and County, shall execute or amend any contract ... with any contractor that discriminates in the provision of bereavement leave, family medical leave, health benefits, membership or membership discounts, moving expenses, pension and retirement benefits or travel benefits as well as any [other] benefits ... between employees with domestic partners and employees with spouses, and/or between the domestic partners and spouses of such employees, where the domestic partnership has been registered with a governmental entity pursuant to State or local law authorizing such registration....

Ordinance § 12B.1(b).

The Ordinance states that this requirement of nondiscrimination extends to

> (i) any of a contractor's operations within San Francisco; (ii) a contractor's operations on real property outside of San Francisco owned by the City or which the City has a right to occupy if the contractor's presence at that location is connected to a contract or property contract with the City; [and] (iii) where the work is being performed by a contractor for the City within the United States.

*Id.* § 12B.1(d). If a contractor is found to have breached these nondiscrimination requirements, the City may impose a $50 penalty per day for each employee affected by the discrimination and may terminate or suspend the contract, in whole or in part. *Id.* § 12B.2(h). In addition, the breaching contractor may be deemed an "irresponsible bidder" and be barred from contracting with the City for up to two years. *Id.* § 12B.2(i).

In 1997, Myers, an Ohio-based corporation, bid on a servicing contract for City-

owned electrical transformers located in Tuolomne County, California. The City notified Myers that the company was the low bidder on the contract, but that in order to be a "responsive bidder," Myers was required to certify its willingness to comply with the Ordinance. Myers declined to certify because compliance with the Ordinance was contrary to the religious and moral principles adhered to by the corporation. Upon Myers's failure to issue the required certification, its bid was rejected by the City.

Myers filed suit urging that the Ordinance be held invalid under the Commerce Clause, Due Process Clause, ERISA, and California law and prayed for relief in the form of a declaratory judgment, an injunction, and money damages. On cross-motions for summary judgment, the district court upheld the Ordinance, except as to a provision, not at issue in this appeal, which required contractors to abide by the Ordinance at "any of a contractor's operations elsewhere within the United States." *See Air Transport Ass'n,* 992 F.Supp. at 1163–64. In a companion case, the district court determined that ERISA preempted the Ordinance as to benefits "covered by ERISA and provided through ERISA plans." *Id.* at 1180. However, the district court did not extend this ruling to Myers because it held that Myers did not have standing to argue ERISA preemption. The district court reasoned that a decision in Myers's favor grounded in ERISA would not redress the injury to Myers in light of its stipulation that "Myers is unwilling to comply with any of the City's equal benefits requirements, even if Myers' unwillingness to comply means that Myers would consequently be ineligible for the award of a City contract."

## II

█ The district court's entry of summary judgment and its resolution of state and federal constitutional issues are reviewed de novo. *See Salve Regina College v. Russell,* 499 U.S. 225, 231, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991); *Valley Bank of Nevada v. Plus System, Inc.,* 914 F.2d 1186, 1189 (9th Cir.1990). We will affirm if the district court applied the correct substantive law and the evidence reveals no genuine issue of material fact when viewed in the light most favorable to the party opposing summary judgment. *See Valley Bank,* 914 F.2d at 1189.

### A.

█ In reviewing challenges to local regulations under the Commerce Clause, we follow a two-tiered approach:

[1] When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, we have generally struck down the statute without further inquiry. [2] When, however, a statute has only indirect effects on interstate commerce and regulates evenhandedly, we have examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits.

*Brown–Forman Distillers Corp. v. N.Y. State Liquor Auth.,* 476 U.S. 573, 579, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986) (internal citations omitted); *see also NCAA v. Miller,* 10 F.3d 633, 638 (9th Cir.1993). The "central rationale" of the dormant Commerce Clause "is to prohibit state or municipal laws whose object is local economic protectionism, laws that would excite those jealousies and retaliatory measures the Constitution was designed to prevent." *C & A Carbone, Inc. v. Town of Clarkstown,* 511 U.S. 383, 390, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994).

"Impact on out-of-state residents figures in the equation only after it is decided that the city is regulating the market rather than participating in it, for only in the former case need it be determined whether any burden on interstate commerce is permitted by the Commerce Clause." *White v. Mass. Council of Constr. Employers, Inc.*, 460 U.S. 204, 210, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983); *see also J.F. Shea Co. v. City of Chicago*, 992 F.2d 745, 748 (7th Cir.1993). For purposes of this appeal, we assume, without deciding, that the City is regulating rather than participating in the market through its enforcement of the Ordinance.

### 1.

■■■ Myers first contends that the Ordinance is facially invalid under a first tier inquiry because it "directly regulates interstate commerce." *NCAA*, 10 F.3d at 638. "Direct regulation occurs when a state law directly affects transactions that take place across state lines or entirely outside of the state's borders." *Valley Bank*, 914 F.2d at 1189–90 (internal quotations omitted). The Supreme Court has emphasized that the "practical effect" of a challenged statute is "the critical inquiry" in determining whether that statute constitutes direct regulation. *Healy v. Beer Inst.*, 491 U.S. 324, 336, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989); *see also Valley Bank*, 914 F.2d. at 1190. "[P]ractical effect ... must be evaluated not only by considering the consequences of the statute itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States...." *Healy*, 491 U.S. at 336, 109 S.Ct. 2491; *see also NCAA*, 10 F.3d at 639–40; *Valley Bank*, 914 F.2d at 1191–92.

■■■ In order to prevail on this facial challenge to the Ordinance, Myers must meet a high burden of proof; it must "establish that no set of circumstances exists under which the [Ordinance] would be valid. The fact that [the Ordinance] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid." *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). Myers asserts we should not apply *Salerno* and argues that *Salerno* has been undermined by recent Supreme Court cases. In place of *Salerno*, Myers would have us craft a new standard, based upon language in *Planned Parenthood v. Casey*, 505 U.S. 833, 895, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), that would hold a law to be facially unconstitutional when it would operate as a substantial obstacle to an otherwise lawful course of action in a large fraction of relevant cases.

Myers supports its argument by pointing out that a plurality of Supreme Court Justices has stated in dicta, "To the extent we have consistently articulated a clear standard for facial challenges, it is not the *Salerno* formulation." *City of Chicago v. Morales*, 527 U.S. 41, 55 n. 22, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (Stevens, J., with two Justices concurring). However, another plurality of Justices is equally adamant that *Salerno* is the correct standard in every context, with the exception of certain First Amendment cases. *See Stenberg v. Carhart*, 530 U.S. 914, 120 S.Ct. 2597, 2655–56, 147 L.Ed.2d 743 (2000) (Thomas, J., dissenting, joined by two Justices); *Planned Parenthood of S. Arizona v. Lawall*, 180 F.3d 1022, 1026 (9th Cir. 1999). While we have held that *Casey* "overruled *Salerno* in the context of facial challenges to abortion statutes," *Lawall*, 180 F.3d at 1027, we will not reject *Salerno* in other contexts until a majority of the Supreme Court clearly directs us to do so. *See Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477,

484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.").

Myers asserts that the Ordinance directly regulates interstate commerce because (1) section 12B.1(d)(i) requires out-of-state contractors with the City to provide equal benefits to all employees located in the City even if they are engaged in business unrelated to a City contract; (2) section 12B.1(d)(iii) requires out-of-state contractors to provide equal benefits to all employees at an out-of-state location if any employees at that location are working on a City contract; and (3) other municipalities and states may adopt legislation conflicting with the Ordinance, creating an administrative nightmare for City contractors.

■ In assessing this argument, we must first decide whether Myers has accurately described the face of the Ordinance. Since Myers will prevail under *Salerno* only if the Ordinance must necessarily be read as directly regulating interstate commerce, we construe the Ordinance narrowly and resolve any ambiguities in favor of the interpretation that most clearly supports constitutionality. *See Able v. United States*, 88 F.3d 1280, 1297 (2d Cir.1996).

The most obvious problem with Myers's reading is that the Ordinance contains no language explicitly or implicitly targeting either out-of-state entities or entities engaged in interstate commerce. Rather the Ordinance applies to all contractors with the City without any reference to the type or extent of a contractor's commercial operations. The Ordinance is therefore unlike the statute we held unconstitutional in *NCAA* which by its terms applied only to

*"national* collegiate athletic associations which have member institutions in 40 or more states." 10 F.3d at 638 (emphasis added). The only such national association was the NCAA, an organization that must actively engage in interstate commerce in order to function properly. *Id.; see also Healy*, 491 U.S. at 341, 109 S.Ct. 2491 ("By its plain terms, the Connecticut affirmation statute applies solely to interstate brewers or shippers of beer, that is, either Connecticut brewers who sell both in Connecticut *and* in at least one border State or out-of-state shippers who sell both in Connecticut and in at least one border State."); *Edgar v. MITE Corp.*, 457 U.S. 624, 641, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982) (plurality opinion) ("The Illinois Act differs substantially from state blue-sky laws in that it directly regulates transactions which take place across state lines.... A tender offer for securities of a publicly held corporation is ordinarily communicated by the use of the mails or other means of interstate commerce to shareholders across the country....").

There is also a problem with Myers's characterization of section 12B.1(d)(iii), which states that the Ordinance applies "where the work is being performed by a contractor for the City within the United States." We agree with Myers that under one interpretation of this provision contractors would be required to provide nondiscriminatory benefits to all employees at a non-City location if there were any employees working on a City contract at the non-City location. However, that is not the only plausible interpretation of the provision supported by the record before us. Another way to read this section is that contractors are required to provide nondiscriminatory benefits to employees working on a City contract, no matter where those employees are located.

A narrow reading of the Ordinance's scope yields an interpretation in which the City (1) requires all contractors with the City to provide equal benefits to all employees located in the City even if they are engaged in business unrelated to a City contract; and (2) requires all contractors to provide equal benefits to those employees working on a City contract even if those employees are located on non-City property. As so construed, employers are "subject to" the Ordinance only as to employees that have direct contact with the City. *See Edgar,* 457 U.S. at 643, 102 S.Ct. 2629 (plurality opinion) ("The limits on a State's power to enact substantive legislation are similar to the limits on the jurisdiction of state courts," citing *Shaffer v. Heitner,* 433 U.S. 186, 207, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977), which held that "[t]he standard for determining whether an exercise of jurisdiction over the interests of persons is consistent with the Due Process Clause is the minimum-contacts standard.")[1]

Further, the Ordinance will affect an out-of-state entity only after that entity has affirmatively chosen to subject itself to the Ordinance by contracting with the City. While we assume for purposes of this opinion that the City is acting in a regulatory capacity rather than as a market participant, it is significant to our "direct regulation" inquiry that the City imposes the Ordinance through contract rather than by legislative fiat. *See Automated Salvage Transport, Inc. v. Wheelabrator Envtl. Sys., Inc.,* 155 F.3d 59, 78 (2d Cir.1998) (holding that although a settlement agreement between a state agency and Wheel-

abrator "affect[ed] the conduct of the Wheelabrator defendants outside of [the state], it is the antithesis of 'direct' regulation").

This part of our Commerce Clause inquiry, however, is not complete for we must determine the "practical effect" of the Ordinance by considering how the Ordinance will interact with the legitimate regulatory regimes of other state and local governments. *See Healy,* 491 U.S. at 336, 109 S.Ct. 2491. Myers hypothesizes,

> Conflicts could arise when other local jurisdictions define the "partnership" or require benefits in ways that could not be reconciled with the City's requirements. For example, [Myers] might comply with the Ordinance by eliminating a marital benefit, then be confronted by another city's regulation that does not permit that option.
>
> Similarly, cities that do not want to advance a public policy affirming nonmarital cohabitation might instruct their purchasing agents not to do business with any contractor that provides "domestic partner" benefits to unmarried couples.

Myers's speculation fails, however, to take into account the *Salerno* standard.

■ By choosing to attack the Ordinance on its face, Myers has the burden of showing that the Ordinance will have the practical effect of directly regulating interstate commerce under all circumstances. This means that, at a minimum, Myers must either present evidence that conflicting, legitimate legislation is already in place or that the threat of such legislation

---

**1.** We do not decide whether the Ordinance could be constitutionally applied in its broader reading—i.e., that contractors are required to provide nondiscriminatory benefits to all employees at a non-City location if there are any employees working on a City contract at that location. Under the *Salerno* standard,

the Ordinance is facially constitutional if there is at least one "set of circumstances" under which it could be valid. *Salerno,* 481 U.S. at 745, 107 S.Ct. 2095. We posit the narrow reading as one such set of circumstances.

is both actual and imminent. *See Huron Portland Cement Co. v. City of Detroit,* 362 U.S. 440, 448, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960) ("And while the appellant argues that other local governments might impose differing requirements as to air pollution, it has pointed to none.... [N]o impermissible burden on commerce has been shown.").

Myers argues that the Supreme Court has held that we are required to speculate about possible legislation that may be enacted. However, upon close examination of Supreme Court precedent it is apparent that the Court has never *invalidated* a state or local law under the dormant Commerce Clause based upon mere speculation about the possibility of conflicting legislation. In *Healy,* for example, the Court determined that a Connecticut price affirmation statute was unconstitutional under the dormant Commerce Clause in part because "the practical effect of [the] affirmation law, in conjunction with the many other beer-pricing and affirmation laws that have been or might be enacted throughout the country, is to create just the kind of competing and interlocking local economic regulation that the Commerce Clause was meant to preclude." 491 U.S. at 337, 109 S.Ct. 2491. The Court then went on to analyze the effects of three such conflicting statutes that had been enacted in Massachusetts, New York, and Rhode Island. *Id.* at 337–39, 109 S.Ct. 2491. In addition, in *Healy* the threat of additional conflicting legislation was real and not speculative. The Court pointed out that "[a]t the time of our decision in *Brown–Forman* [three years earlier], 39 States ... had adopted affirmation laws." *Id.* at 334 n. 10, 109 S.Ct. 2491; *see also Brown–Forman,* 476 U.S. at 583, 106 S.Ct. 2080 ("the proliferation of state affirmation laws ... has greatly multiplied the likelihood that a seller will be subjected to inconsistent obligations in different

States."); *Edgar,* 457 U.S. at 631 n. 6, 102 S.Ct. 2629 ("Takeover statutes are now in effect in 37 States.").

Our precedent follows this interpretation of the Supreme Court's holding in *Healy.* In *NCAA* we stated

> Nevada is not the only state that has enacted or could enact legislation that establishes procedural rules for NCAA enforcement proceedings. Florida, Illinois, and Nebraska have also adopted due process statutes and similar legislation has been introduced in five other states.... The serious risk of inconsistent obligations wrought by the extraterritorial effect of the Statute demonstrates why it constitutes a per se violation of the Commerce Clause.

*NCAA,* 10 F.3d at 639–40 (internal footnotes omitted). Myers makes much of our phrase "or could enact legislation," asserting that it requires us to hypothesize about potential future conflicts. However, it is clear in context that the likelihood of conflicting legislation in *NCAA* was far from speculative. Such legislation had in fact been adopted by three states and introduced in five states. In addition, we emphasized that the risk of inconsistent regulation was "serious." *Id.* at 640; *see also Old Bridge Chemicals, Inc. v. New Jersey Dep't of Envtl. Prot.,* 965 F.2d 1287, 1293 (3d Cir.1992) ("Although the Supreme Court has at times invalidated a state regulation because of the *possibility* that it might conflict with another state's regulation, in more recent cases the Court has required a demonstration of *actual conflict.*" (internal quotations omitted)); *Valley Bank,* 914 F.2d at 1192 ("[The plaintiff] speculates that other states will pass similar but inconsistent legislation....").

Because Myers has not brought to our attention any actual or pending legislation that conflicts or would conflict with the

Ordinance, we uphold the Ordinance against Myers's facial attack under the Commerce Clause.

### 2.

 Myers argues that even if the Ordinance is not facially invalid under a first-tier inquiry that the Ordinance should be invalidated as applied because the burden it imposes on interstate commerce is "clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). Under the *Pike* balancing approach, "[i]f a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved . . . ." *Id.* We have stated, "Even in the context of dormant commerce clause analysis, the Supreme Court has frequently admonished that courts should not second-guess the empirical judgments of lawmakers concerning the utility of legislation." *Pac. Northwest Venison Producers v. Smitch*, 20 F.3d 1008, 1017 (9th Cir.1994) (internal quotation omitted); *see also Alaska Airlines, Inc. v. City of Long Beach*, 951 F.2d 977, 983 (9th Cir.1991) ("For a facially neutral statute to violate the commerce clause, the burdens of the statute must so outweigh the putative benefits as to make the statute unreasonable or irrational.").

 Of course, the Ordinance affected Myers: the City decided not to contract with Myers after Myers refused to certify that it would comply with the Ordinance. On appeal and in the district court, Myers has relied solely on conclusory statements about the burden the Ordinance has on interstate commerce. For example, in response to an interrogatory asking Myers to provide an estimate of the cost to itself of implementing a benefits program for domestic partners of employees, Myers stated, "[Myers] cannot offer an estimate specific to the contract that is at issue in this lawsuit, as it is not known if any of the employees who would have been assigned have, or would have acquired, 'domestic partners.'" Myers did state that the cost of providing only family medical benefits was approximately $300 per month; however, this figure provides almost no indication of the economic impact of the Ordinance on interstate commerce. While we do not require a dollar estimate of the effect the Ordinance will have, we do require specific details as to how the costs of the Ordinance burdened interstate commerce. The Commerce Clause is concerned with the free flow of goods and services through the several states; it is the *economic* interest in being free from trade barriers that the clause protects. *See Carbone*, 511 U.S. at 390, 114 S.Ct. 1677; *On the Green Apartments L.L.C. v. City of Tacoma*, 241 F.3d 1235, 1238 (9th Cir.2001).

Myers also challenges the legitimacy of the purported benefits of the Ordinance to the City. We held in *Alaska Airlines*, 951 F.2d at 983, that the burdens on interstate commerce of a statute will outweigh the benefits if the "asserted benefits of the statute are in fact illusory." Myers argues that the benefits arising out of the Ordinance are illusory because the Ordinance allows contractors and vendors with the City to avoid the effects of the Ordinance by seeking a "sole source" exemption. This exemption has been granted by the City on numerous occasions. For example, when the City wanted to buy unique pieces of art for the airport, it waived the application of the Ordinance as to the "sole source," the art broker, from whom it could purchase the art. The sole source exemption, however, is a rational response to the problems that might arise for the

City should the sole source of a needed (or desired) product or service refuse to do business with the City on account of the Ordinance. The City "need not strike all evils at the same time." *Katzenbach v. Morgan,* 384 U.S. 641, 657, 86 S.Ct. 1717 (1966) (internal quotation omitted). We hold that the burden on interstate commerce evidenced in the record does not clearly outweigh the City's legitimate interest in applying the Ordinance to those with whom it contracts.

### B.

■■■ Myers next argues that the Ordinance is facially invalid under principles of due process because the Ordinance exerts extraterritorial control over Myers's lawful choice not to provide benefits to domestic partners. For this assertion, Myers relies primarily upon *BMW of N. America, Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), in which the Supreme Court stated, "a State may not impose economic sanctions on violators of its laws with the intent of changing the tortfeasors' lawful conduct in other States." *Id.* at 572, 116 S.Ct. 1589. The Supreme Court stated that "[t]o avoid such encroachment, the economic penalties that a State ... inflicts on those who transgress its laws, whether the penalties take the form of legislatively authorized fines or judicially imposed punitive damages, must be supported by the State's interest in protecting its own consumers and its own economy." *Id.*

In order for Myers to succeed on this argument, it must first persuade us that the provisions of the Ordinance constitute "economic penalties" under *BMW.* The Ordinance does provide that a contractor who has agreed to comply with the Ordinance and then breaches that promise will be subject to economic consequences, including fines. Ordinance §§ 12B.2(h)-(i). In

addition, the City will refuse to contract with those who fail to certify that they will comply with the Ordinance. These economic consequences, however, are significantly different from the "economic penalties" disfavored in *BMW,* which dealt with punitive damages awarded in a state tort case. Punitive damages are imposed on unwilling defendants. *See BMW,* 517 U.S. at 568, 116 S.Ct. 1589. The breach of contract provisions in the Ordinance will only apply if a City contractor consents to be bound by its terms. Similarly, an entity will be denied the ability to contract with the City only after it has chosen not to meet the City's requirements.

Even were we to assume that the Ordinance's requirements constitute an economic penalty, narrowly construed the Ordinance only applies in the City, on City-owned property, or as to employees working on a City contract. Thus, the Ordinance is "supported by the [City]'s interest in protecting its own consumers and its own economy." *Id.* at 572, 116 S.Ct. 1589. While it is possible that the City could attempt to wield extraterritorial control through broadly interpreting section 12B.1(d)(iii), on this facial challenge we will not invalidate the Ordinance unless Myers can "establish that no set of circumstances exists under which the [Ordinance] would be valid." *See Salerno,* 481 U.S. at 745, 107 S.Ct. 2095.

### C.

Article 11, section 7 of the California constitution provides, "A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." A charter city, like the City, may "make and enforce all ordinances and regulations in respect to municipal affairs ... [I]n respect to other matters they shall be subject to general laws." Cal. Const. art.

11, § 5. Myers makes two arguments based on these constitutional provisions. First, Myers argues that the recently enacted California Family Code (Family Code) § 297 et seq. is a general law conflicting with, and thereby preempting, the Ordinance. Second, Myers asserts that the Ordinance constitutes extraterritorial, governmental regulation prohibited by the California constitution.

### 1.

■ Family Code § 297 et seq. was not signed into law until October 2, 1999, after the district court had already ruled on Myers's claims. Thus, this issue is raised for the first time on appeal. Generally, we will not consider such arguments. See United States v. Carlson, 900 F.2d 1346, 1349 (9th Cir.1990). We have, however, recognized an exception when "a change in the law raises a new issue pending appeal." In re Home America T.V.-Appliance Audio Inc., 232 F.3d 1046, 1052 (9th Cir. 2000). Rather than deciding the merits of this argument on the record we now have before us, we remand this issue to the district court to decide.

### 2.

■ Myers contends that the Ordinance is invalid under the California constitution because the Ordinance has the effect of regulating outside the geographic boundaries of the City. When interpreting state law, we are bound by decisions of the state's highest court. Strother v. S. Cal. Permanente Med. Group, 79 F.3d 859, 865 (9th Cir.1996). If there is no such decision available, then we "must predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance." Id. (internal quotation omitted).

■ The California Supreme Court has held, "A municipal corporation has generally no extraterritorial powers of regulation. It may not exercise its governmental functions beyond its corporate boundaries." City of Oakland v. Brock, 8 Cal.2d 639, 67 P.2d 344, 345 (1937) (emphasis added). The City may, however, exercise proprietary powers with respect to property it owns even if that property lies outside the City's corporate boundaries. Air Cal, Inc. v. City & County of San Francisco, 865 F.2d 1112, 1117 (9th Cir.1989). The proprietary power encompasses the ability of the City as owner to enter into commercial relationships. Id.

An earlier incarnation of Ordinance Chapter 12B provided that contractors with the City were required to refrain from discrimination. In ruling on the validity of this ordinance, the California appellate court wrote,

Chapter 12B ... is an exercise of the City's contracting power. The ordinance does not ban discrimination in employment but merely prescribes certain provisions in City contracts. Those who find such provisions burdensome may simply refuse to contract....

In several opinions, the Attorney General has recognized that a local agency's insertion of nondiscrimination provisions in its contracts is an exercise of its contracting power which falls outside the scope of the police power.... In explaining the basis for his decision that the Berkeley Board of Education might properly include clauses prohibiting discrimination in employment in its construction contracts, the Attorney General observed that such clauses "would be intended and designed to protect the school district from entering into a contract for or expending funds on a project executed in a manner contrary to the laws of the state. Such

clauses constitute examples of the exercise by the local entity of its contracting power, a determination of the nature of the contractual obligations it may desire to enter into and a requirement which provides a remedy not for the injured employee, but, instead, a remedy to the public agency for the special injury it suffers."

*Alioto's Fish Co. v. Human Rts. Comm'n of San Francisco,* 120 Cal.App.3d 594, 174 Cal.Rptr. 763, 768 (1981).

Myers argues that *Alioto's* should not apply in this case because the Ordinance requires not only nondiscrimination but the affirmation of a particular lifestyle. However, we believe that the changes are not so significant as to undermine *Alioto's* reasoning, and we hold that, under California law, the Ordinance is an exercise of the City's contracting power. As such, the City is not acting extraterritorially when it uses that power in conjunction with its proprietary power over City property.

 In addition, the California Supreme Court recently indicated, although it did not decide, that California authority would support holding that "the mode in which a city chooses to contract is a municipal affair." *Associated Builders & Contractors, Inc. v. San Francisco Airports Comm'n,* 21 Cal.4th 352, 87 Cal.Rptr.2d 654, 981 P.2d 499, 506 (1999). Here, Myers attacks the mode of contracting rather than the subject matter of any particular contract. That is, Myers is not arguing that the City exercised extraterritorial control in seeking bids on a service contract for the City electrical transformers (subject matter); instead, Myers contests the City's refusal to contract with those who fail to comply with the Ordinance (mode of contracting). We hold that under current California law, the City's chosen mode of contracting is a municipal affair over which the City may exercise its

authority without violating the California constitution. *See* Cal. Const. art. 11, § 5.

## III.

 Myers's final argument is that the district court erred in holding that Myers lacks standing to make an ERISA preemption claim. We review the question of standing de novo. *W. Radio Servs. Co. v. Espy,* 79 F.3d 896, 902 (9th Cir.1996). In order to satisfy the Constitution's case-or-controversy requirement, Myers must show

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. Inc.,* 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). Myers, as "the party invoking federal jurisdiction[,] bears the burden of establishing these elements." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). To meet this burden at the summary judgment stage, Myers "must set forth by affidavit or other evidence specific facts" supporting each element. *Id.* (internal quotations omitted).

Myers stipulated that it was "unwilling to comply with any of the City's equal benefits requirements, even if Myers' unwillingness to comply means that Myers would consequently be ineligible for the award of a City contract." Myers went on to specify that while it provides non-ERISA benefits such as bereavement leave and family medical leave to married employees, it would be unwilling to provide those benefits to employees with domestic

partners. In light of this stipulation, the district court held Myers did not have standing as to its ERISA claim. The district court reasoned that Myers "has declared that it will not provide its non-ERISA benefits to domestic partners of employees. Thus [Myers] would still be ineligible to receive a contract with the City, so judicial relief on its ERISA preemption claim would not redress [Myers's] alleged injury...."

Myers argues that under *Larson v. Valente*, 456 U.S. 228, 243 n. 15, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982) (plurality decision), it has standing as to its ERISA claim because judicial relief would redress a "discrete injury." In *Larson*, the Unification Church alleged that a section of a Minnesota Act "imposing certain registration and reporting requirements upon only those religious organizations that solicit more than fifty per cent of their funds from nonmembers" (the fifty per cent rule) violated the Establishment Clause. *Id.* at 230, 102 S.Ct. 1673. The Minnesota Act as a whole provided that all charitable organizations, except religious organizations, were subject to registration and disclosure requirements. *Id.* at 230–31, 102 S.Ct. 1673. The fifty per cent rule created an exception to the broad exemption for religious organizations. *Id.* at 231–32, 102 S.Ct. 1673. Minnesota argued that the Unification Church lacked standing to attack the fifty per cent rule unless it could first establish that it was a religious organization. Minnesota reasoned that the registration requirements constituted the injury to the Church and that this injury could not be redressed unless the Unification Church both qualified for the religious organization exemption and prevailed on its Establishment Clause claim. The Supreme Court disagreed and held that "a plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to

himself. He need not show that a favorable decision will relieve his *every* injury." *Id.* at 243 n. 15, 102 S.Ct. 1673.

*Larson* demonstrates that Myers would have standing even if it had struck at the Ordinance using only ERISA because encroachment on Myers's rights under ERISA would constitute a "discrete injury" traceable to the Ordinance and redressable by the injunctive and declarative relief requested by Myers. The stipulation, however, has a profound effect on the way we view Myers's alleged injury to his rights under ERISA: it is now evident that the alleged injury was never "actual or imminent" since Myers would not have contracted with the City even if Myers were required only to provide non-ERISA benefits. Myers's position would be analogous to that of the Unification Church in *Larson* only if the Unification Church had stipulated that it was *not* a religious organization and the Court still ruled on the constitutionality of the fifty per cent rule—a plainly preposterous result.

On appeal, Myers attempts to circumvent the effect of its stipulation by arguing that since the Ordinance requires equal treatment, it could simply refuse non-ERISA benefits to all its employees. Myers would then have the option of complying with the Ordinance without having to provide any benefits to employees with domestic partners. Myers did not make this argument before the district court. *See Carlson*, 900 F.2d at 1349 ("Our general rule is that we will not consider issues raised for the first time on appeal."). Nor did Myers attempt to withdraw or clarify the stipulation, which specifies that Myers provides non-ERISA benefits to married employees but that it would not provide such benefits to employees with domestic partners. The plain implication of this language is that Myers would continue to provide non-ERISA benefits to its married

employees even if that meant it would be ineligible to contract with the City.

Thus, deciding Myers's claim under ERISA would be to render an unconstitutional advisory opinion. *See Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 101, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (stating that advisory opinions have been disapproved "from the beginning"). Myers's stipulation has shown its alleged injury under ERISA to be "hypothetical" and "conjectural" rather than "actual or imminent." *See Lujan,* 504 U.S. at 560, 112 S.Ct. 2130 (internal quotation omitted).

AFFIRMED, AND REMANDED IN PART